## Gray vs. Hook.

Where two persons apply to the governor of the state to be appointed to the same office, and it is agreed that one of them shall withdraw his application and aid the other in procuring the appointment, in consideration of which the fees and emoluments of the office are to be divided between them, such contract is illegal and void.

Such an agreement, it seems, is not within the statute respecting the sale of offices, but is void by the common law.

All agreements by which one person engages to pay another for his aid or influence in procuring an appointment to office, it seems, are illegal and void.

Where one party to an illegal and void parol contract performs on his part and then takes from the other a covenant to perform on his part, the covenant is void.

And the covenant is void, although it has a new and legal consideration, provided it is also founded upon the original illegal contract.

A seal does not protect an illegal contract, nor prevent inquiry into the legality of the consideration.

Every new agreement entered into for the purpose of carrying into effect any of the unexecuted provisions of a previous illegal contract, is void.

APPEAL from a judgment of the supreme court, affirming a judgment of the court of common pleas of the city and county of New-York, upon a writ of error, founded on a bill of exceptions taken at the trial in the latter court. The action was covenant, brought by Gray against Hook upon an instrument read as evidence on the trial, as follows :

" Memorandum of an agreement made and entered into, the 1st day of July, 1842, between John Hook of Westchester [450] county and state of New-York, of the first part, and John Gray

of the city of New-York, of the second part. Whereas, upon a settlement of certain accounts and transactions between the parties hereto, relative to the fees collected in the office of the inspector of flour in the city of New-York, the said party of the second part did give to the said party of the first part, his certain promissory note, payable 60 days after date, for the sum of $376,85, as a full settlement of all accounts and balances existing between them, with the exception of certain liabilities and expenses already incurred, or which may hereafter be incurred by the said John Gray, in and about certain proceedings existing between the said John Gray and one Christopher P. Tappan, and for which the said John Hook is liable to pay an equal one half thereof. And whereas, the said John Gray has declined to pay said note above mentioned, by reason of certain further proceedings having been taken by the said Christopher P. Tappan, against said John Gray, relative to the said office of inspector of flour, and of the fees of the said office, and for any liability already incurred, or hereafter to be incurred by the said John Gray in said proceedings the said John Hook is liable, and the said John Hook hereby admits his liability to pay his equal one half thereof. And whereas the said John Hook is desirous to have the said note paid and has applied to said John Gray to pay the same, the said note having been passed to one Henry F. Ketchum of the city of New-York. Now, therefore, in consideration of the promises of the payment of the said note by the said John Gray, and the sum of one dollar, to him in hand paid, the receipt whereof is hereby acknowledged, the said John Hook hereby covenants, promises and agrees to and with the said John Gray, to pay him, said John Gray, the full and equal one half of all liabilities of every kind, manner or description heretofore incurred, or which may be hereafter incurred by the said John Gray, or which the said John Gray may be liable to pay, for or by reason of any suit or suits, proceeding or proceedings heretofore brought, now pending, and which may hereafter be brought by the said Christopher P. Tappan, relative to the said office of [451] inspector of flour, or to the fees of said office, hereby cov-

enanting, promising and agreeing to hold said John Gray harmless and indemnified in the premises, and to pay such one half of any such liabilities to said John Gray upon demand.

In witness whereof the said parties hereto have hereunto set their hands and seals, the day and year first above written.

(Signed)          John Hook. [L. s.]

John Gray. [L. s.]"

The plaintiff then introduced and proved the making of the following note:

"New-York, March 4, 1842.

Six days after date I promise to pay to the order of John Hook three hundred and seventy-six $\frac{85}{100}$ dollars, for value received. $376\frac{85}{100}$.        (Signed)       John Gray."

(Indorsed)   "John Hook."

The plaintiff then proved the existence and nature of the legal proceedings of Tappan against Gray; that they were a suit in chancery prosecuted against Gray for the purpose of obtaining an injunction, restraining him from receiving the fees and perquisites of the office of inspector of flour in the city of New-York, to which office the said Gray had been appointed in the place of Tappan, whose term of office had expired during the recess of the senate, on the ground that the said Gray had been illegally appointed; and that one half of the expenses in defending these proceedings amounted to $284,83, and then rested.

The counsel for the defendant, under a notice subjoined to the plea of *non est factum*, offered to prove the following facts: That the plaintiff Gray and the defendant were candidates at the same time for the office of inspector of flour; that their chances of success in obtaining the appointment to the said office of inspector of flour from the executive of this state, William H. Seward, were about equal; that there was an arrangement entered into between the defendant and the plaintiff Gray, whereby the defendant was to withdraw his application for the appointment to the office of inspector of flour in the city [452] and county of New-York; that by his so withdrawing his application for the appointment to the said office of inspector of

flour, and by aiding the said Gray in obtaining the said appointment, he, the defendant, was to receive one half of the fees and emoluments arising and accruing from the said office of inspector of flour, during the term and as long as the said Gray held said office ; that through the aforesaid arrangement between the defendant and the said plaintiff Gray, the said Gray was, on or about the 27th day of May, 1839, appointed to the said office ; that on or about the same time, he, the said Gray, appointed the defendant a deputy inspector ; that the said note of $376,85 was given to the defendant by the plaintiff for his services as such deputy ; that the said note was passed by the defendant in the ordinary course of business to one Henry F. Ketchum, that the same was duly protested for non-payment ; that the said Gray declined and refused to pay the said note in consequence of certain proceedings in law instituted by one Christopher P. Tappan, relative to said office of inspector of flour, against the said Gray, until the said Hook should sign an agreement to pay one half of the costs and expenses incurred by the said Gray by reason of the said proceedings of the said Christopher P. Tappan against him, as the defendant was to receive an equal proportion of the said office of inspector of flour, whereupon the said defendant made and executed such an agreement as mentioned and set forth in the plaintiff's declaration ; and that the said liabilities mentioned in the several counts of the said plaintiff's declaration, if any did accrue, arose from an agreement to divide the fees of said office of inspector of flour as aforesaid, and was a part of the consideration thereof." To which testimony the plaintiff objected, and the evidence was rejected by the judge who presided, on several grounds mentioned in the bill of exceptions. The jury found a verdict for the plaintiff for $284,83, upon which judgment was rendered in the common pleas, which was sustained in the supreme court on error. The defendant appealed to this court.

[453] *James T. Brady,* for appellant. The agreement of July, 1842, was void by statute and common law. (1.) As part of a

bargain for the sale of an office, or one half of the fees thereof. (1 *R. L. of* 1818, *p.* 109; 2 *R. S.* 696, §§ 35, 36, 97; *Tappan* v. *Brown,* 9 *Wend.* 175.) (2.) As made in consideration of an illegal deputation to an office. (3.) As an agreement founded in part, if not wholly, on an illegal consideration. (*Thayer* v. *Rock,* 13 *Wend.* 53; *Parsons* v. *Thompson,* 1 *H. B. C.* 522; *Chit. on Cont.* 672; *Law* v. *Law,* 3 *P. Wms.* 391; 1 *Cowen's Tr.* 271; 1 *Aiken's Rep.* 264; 4 *Halst.* 352.) (4.) As a contract for maintenance. (1 *Cowen's Treatise,* 275, *citing* 8 *John.* 220.)

The agreement being void, neither party can have the aid of the court in enforcing it. (4 *Hill,* 424.)

The court of common pleas assume that the note was given for Hook's services as deputy, for which he had a legal right to be paid. This assumption is unfounded and unjustifiable. The note is so interwoven with the illegal agreement, that they can not be separated, and is therefore void. (*Tappan* v. *Brown, ut supra.*) The offer was to show this. The question should at all events have been left to the jury. In fact the note, as shown by the agreement, was given on a settlement of account as to the fees of the office, &c.

*N. Hill, Jr.* for respondent. The gist of the defence is an alledged agreement between the parties to divide the office of inspector of flour, in consideration of the appellant's withdrawing his application for the office, the consequent withdrawal of the appellant, and his subsequent appointment to the office of deputy, and giving of the note of $376,85. Now the statute does not touch the original agreement. It only applies to an agreement by an incumbent to sell offices. (*See* 2 *R. S.* 580, §§ 35, 36.) And if it did, it does not appear, nor is it averred, that the appellant's appointment, or the giving of the note, was in consideration or pursuance of the original agreement.

The covenant was legal and valid. It was not *founded* on a contract for the sale of an office. To be void under the statute, the agreement on which the action is brought must be [454] shown to have formed *an integral part of the contract* for the sale *of the office.* If it be executed subsequently, and not as forming

part of the agreement to sell, it is as valid as though no such agreement had existed. (*Richardson* v. *Mellish*, 2 *Bing.* 229 ; *Baldwin* v. *Bridges*, 2 *J. J. Marsh* 10 ; *Card* v. *Hope*, 2 *B. & C.* 661 ; *Greville* v. *Atkins*, 9 *id.* 462 ; 2 *Phil. Ch. Rep.* 801, 817, 818 ; 5 *Barr*, 81, 82 ; 11 *Wheat.* 269, 275.) This principle has been recognized in analogous cases, as in the instance of a bond given in consideration of past cohabitation. (*Gilson* v. *Dickie*, 3 *M. & Sel.* 463 ; *Turner* v. *Vaughan*, 2 *Wils.* 339 ; *Knye* v. *Moore*, 2 *Sim. & Stu.* 260 ; *Nye* v. *Morely*, 6 *B. & C.* 133.) Even if there were an original agreement between the parties, which was invalid, either by reason of its being prohibited by the statute, or against public policy, the agreement in question is valid. (*Tenant* v. *Elliott*, 1 *B. & Pull.* 3 ; *Farmer* v. *Russell*, 3 *id.* 296 ; *Doty* v. *Wilson*, 14 *John.* 379, 81 ; *Chitty on Cont.* 678, *ed. of* 1842 ; *Kneeland* v. *Rogers*, 2 *Hall*, 579.) The purpose of the agreement in question was lawful, and the consideration sufficient. The agreement was under seal. If there were any invalidity in the arrangement between the parties, the note given by the respondent, mentioned in the agreement, was void. It does not appear to have been valid in the hands of Ketchum, and it was paid to induce the appellant to give the covenant declared upon.

MULLETT, J. Was the original or primary agreement between Gray and Hook, in reference to procuring Gray's appointment to the office of inspector of flour, as offered in evidence by the defendant, illegal and void? The contract, together with the circumstances attending the making of it, and which are useful in its construction, amounted to this : Gray and Hook, both being applicants to the constitutional appointing power for the office of inspector of flour in the city of New-York, and considering their chances of obtaining the appointment about equal, made an agreement by which Hook was to withdraw *his* application and aid Gray in procuring the appointment, in considera-[455] tion of which Gray was to allow Hook to receive one half of the fees and emoluments of the office as long as Gray held it. This is all of the agreement part of the transaction which

Gray v. Hook.

was offered to be proved; the remainder of the facts offered in proof relate to what followed this agreement, in the execution or performance of it. Had the agreement included what the offer seems to intimate, and what the conduct of the parties justify us in suspecting, that a part of the agreement was that Gray should also appoint Hook his deputy, I should have no doubt that the agreement, when executed, would be in direct violation of the statute against buying and selling offices, notwithstanding the propositions for the agreement were made and entertained before Gray received his appointment. (2 *R. S.* 696, §§ 34, 35, 36.) But there is nothing about the appointment of deputy expressed in the arrangement which the defendant offered to prove, though the whole transaction, as offered in evidence, shows that the appointment of Hook as deputy sustains a very suspicious proximity and relationship to the agreement. The agreement in its original form, as offered in evidence, is not therefore within the literal reading of the statute. But is it not void by the principles of the common law, as against public policy? Comyn says, " All contracts or agreements which have for their object any thing which is repugnant to justice, or against the general policy of the common law, or contrary to the provisions of any statute, are void; and whenever a contract or agreement is entered into with a view to contravene any of these general principles, there is no form of words, however artfully introduced or omitted, which can prevent courts of law and equity from investigating the truth of the transaction, for *ex turpi contractu actio non oritur*, is a rule both in law and equity." (1 *Com. on Cont.* 30; 1 *Fonbl. Eq. b.* 1, *ch.* 4, § 4; 1 *Story's Eq.* 296; 4 *Hill*, 424; 4 *Cond. Rep.* 304; 11 *Wheat.* 258.) This general principle is universally recognized by the American courts, and has frequently been applied, in this state, to contracts which had for their object the perversion of the more ordinary operations of the government, such as contracts to prevent fair competition at legal auction sales; (3 *John.* 29; 6 *id.* 194; 8 *id.* 444;) and contracts to prevent the due [456] administration of the insolvent laws. (3 *Caines*, 213; 2 *John.* 386; 4 *id.* 410; 9 *id.* 295; 19 *id.* 311.)

There is quite as much reason for applying this principle to contracts made for the purpose of influencing and perverting the more important and extensive operations of the legislative and executive powers of the government. Every citizen owes to his government and all its officers while executing their official duties, truth and fidelity. All the actions of the government and its officers, are based upon certain facts, assumed, or proved, and falsehood and deception in reference to these facts are moral wrongs, injurious to the whole state, whose government it is, and therefore against public policy. The strength, durability and prosperity of our political institutions, depends entirely, on the intelligence, integrity and faithful support of the people. No citizen can, therefore, legally stipulate to embarrass the operations of government, by diminishing its means to execute its powers. It has been decided by the supreme court of New-Jersey, that where A. and B. contemplated applying to the postmaster general for a contract to carry the mail, and A. agreed to give B. $1,000, on condition that he would forbear to propose or offer himself to the postmaster general to carry the mail on a certain route, such agreement was against public policy, and no action could be maintained upon it. (5 *Halst. Rep.* 78.) The supreme court of Pennsylvania has decided, that a contract founded upon a promise and engagement to procure signatures to a petition and obtain a pardon from the governor, for one convicted of a crime and sentenced to punishment, was unlawful and could not be enforced by an action. (7 *Watts' Rep.* 152.) Also, that a contract to procure, or endeavor to procure the passage of an act of the legislature by any sinister means, or by using personal influence with the members, was void, as being inconsistent with public policy, and the integrity of their political institutions. (5 *Watts & Serg.* 315.) So an agreement to pay a man for exerting an influence over a railroad company, to induce them to locate their depot at a particular place, was [457] decided to be unlawful and void by the supreme judicial court of Massachusetts. (18 *Pick. Rep.* 472.) An agreement by an administrator to sell the land of an intestate, when a surrogate's order for that purpose should be obtained, to a particu-

lar person, was declared to be void by the supreme court of New-York. (3 *Cowen*, 299.)

By the agreement under consideration, Hook was to withdraw his application, which he had already made, and aid Gray in pursuing his, not for a fixed and certain pecuniary consideration merely, but he was to have one equal half of the fees and emoluments of the office, as long as Gray should hold it. Thus stipulating for a dangerous influence over a profitable office which was not intrusted to him, and for the performance of the duties, of which he was under no pecuniary or official obligation. This is the nature of the original agreement, as offered to be proved, excluding all stipulation respecting the deputyship. I think that this contract was void, because it stipulated that Hook should have a pecuniary compensation for withdrawing his application by which he had probably driven off competition, and contributed to reduce the number of applicants to himself and Gray. I have no doubt that it is void, because it stipulated that Hook should have a pecuniary compensation for aiding Gray to obtain the appointment. And I have no doubt that any agreement between two citizens, by which one stipulates to pay the other a proportion of the fees and emoluments of a public office which he is seeking, in consideration that that other will aid him in obtaining it, is void.

That the original agreement between Gray and Hook was illegal and void, appears to have been the opinion both of the common pleas and the supreme court in the case under consideration. If the original agreement between Gray and Hook was illegal and void, it appears to me that the proof given, and that offered on the trial, would sufficiently connect the covenant, on which this action was brought, with the original illegal agreement, to give it the same character. This proof would have shown that by the original agreement Hook was to have one equal half of the fees and emoluments of the office of inspector of flour *as long as Gray held the office;* that Gray was [458] appointed to the office about the 27th day of May, 1839.

The recital contained in the covenants upon which this suit is brought and which is dated July 1st, 1842, and signed by both

parties, shows that upon a settlement of certain accounts and transactions between Gray and Hook in *relation to the fees collected in the office of inspector of flour*, Gray gave to Hook his note (which is produced by Gray, and bears date March 4, 1841,) for $376,85, payable in sixty days, in full settlement of all accounts and balances existing between them, *except the expenses and liabilities incurred and to be incurred by Gray in certain proceedings between him and Tappan relating to the said office of inspector of flour, and the fees of said office, for which Hook was liable to pay one-half;* and in the body of the covenant it is stated, that in consideration of the premises and of the payment of the note by Gray, and of the sum of one dollar paid by him, Hook covenants, promises and agrees to pay Gray the full, equal one-half of all *liabilities incurred, or which might thereafter be incurred by him by reason of the suit or proceedings brought or to be brought by Tappan against Gray, or by him against Tappan, relative to said office of inspector of flour, or the fees of said office.* And the proof offered was, that Gray insisted on Hook's giving the covenants to pay half of the expenses in the Tappan proceedings, *as Hook was to receive one equal proportion of the said office of inspector,* and that the several liabilities mentioned in the plaintiff's declaration, if any did accrue, arose *from an agreement to divide the fees of the said office of inspector*, and was a part of the consideration thereof.

I think the facts proved, and those offered in evidence, tended strongly to the conclusion, that Gray's claim upon Hook for one-half of the expenses of defending the Tappan suits, was part of the same agreement by which he gave Hook one-half of the fees and emoluments of the office of inspector; and that such evidence should have been received and submitted to the jury. If this view of the subject should be sustained, the whole transaction would be reduced to this: Gray, on the performance of his part of an illegal parol contract, received from [459] Hook a covenant for the performance of his part of the same illegal agreement.

I have not alluded to the fact of the transfer of Gray's note to Ketchum, nor the payment of the note by Gray, because I

can not perceive that these facts alter the relation between the parties. Whether Gray paid the balance to Hook on the settlement, and then took the covenent; or whether he took the covenant on giving his note for the balance; or whether he gave Hook the money to take up the note from Ketchum, and then took the covenant; or whether he paid the money on the note to Ketchum at the request of Hook, who was liable as indorser, and thereupon took the covenant, would all amount to the same thing as between Gray and Hook. The covenant would still be for the performance of the old agreement. The change of the contract to a covenant could make no difference in its legality. A seal can not protect an illegal contract, nor prevent an inquiry into the legality of its consideration. (*Com. on Cont.* 30; 2 *Wils. Rep.* 341, 347; 1 *P. Wms.* 156, 220; 4 *John.* 410; 19 *id.* 311.)

Nor did the addition of one honest dollar cure the illegality of the remainder of the consideration. When the contract grows immediately out of and is connected with an illegal or immoral act, a court of justice will not lend its aid to enforce it; and if the contract be in *part only* connected with the illegal transaction, and grows immediately out of it, though it be in fact a new contract, it is equally tainted by the illegality of the transaction from which it sprung. (4 *Wash. C. C. Kep.* 297; 11 *Wheat.* 258; 4 *Denio,* 63.)

The distinction between a void and valid new contract, in relation to the subject matter of a former illegal one, depends upon the fact, whether the new contract seek to carry out or enforce any of the unexecuted provisions of the former contract; or whether it is based upon a moral obligation growing out of the execution of an agreement which could not be enforced by law, and upon the performance of which the law will raise no implied promise. In the first class of cases no change in the form of the contract will avoid the illegality of the first consideration; while express promises based upon the last class [460] of considerations may be sustained. Mr. Chitty says the test whether a demand connected with an illegal transaction is capable of being enforced at law, is, whether the plaintiff requires

any aid from the illegal transaction to establish his case. (*Chitty on Cont.* 657, *and authorities there cited.*)

In this case, the covenant which the plaintiff produced as the foundation of his action, recites and acknowledges its relationship with, and dependance upon, the former illegal agreement respecting the office of. inspector. On the whole I think the judgment appealed from is erroneous and ought to be reversed, and a new trial granted.

Judgment reversed.