## ELIZA A. STAUNTON, CAROLINE L. ELY AND ALMIRA F. BEERS, Heirs at Law and next of Kin of JOSEPH FIELD, Deceased, Appellants, v. WILLIAM J. PARKER, Respondent.

*Testimony of attending physician as to mental capacity of testator — when admissible — section 834 of the Code of Civil Procedure — An agreement to renounce the office of executor while the testator is living — void.*

Probate of the second codicil of the testator's will, by which the respondent was appointed one of his executors, was opposed by his three daughters and one other legatee, on the ground that he was incompetent to execute a will at the time of its date, and also on the ground of undue influence exerted by the respondent. Upon the hearing, the contestants called the physician who had attended the deceased for eight years previous to his decease, for the purpose of showing that he was incompetent to make a will at the time of executing the codicil. The physician having stated that all his knowledge was derived from what he observed while he was attending the deceased professionally, his evidence was excluded by the surrogate.

*Held,* that the evidence was not prohibited by section 834 of the Code of Civil Procedure, as being information acquired while attending the deceased professionally and which was necessary to enable him to do so.

That even if the prohibition therein contained were applicable, the contestants, as the personal representatives of the deceased, might waive it.

An agreement by one who has been named as executor in a will, made, prior to the death of the testator, and contrary to his expressed wishes, by which, for a valuable consideration, he agrees to renounce the office, is void as against public policy.

APPEAL from a decree of the surrogate of Monroe county, admitting to probate the will of Joseph Field, deceased, and two codicils thereto.

On the 20th day of April, 1876, Joseph Field made his will, devising about $450,000 in specific legacies, dividing the balance of his estate (estimated at about $1,000,000) among his three daughters, and nominated his said three daughters, and Mr. Joseph A. Eastman, as executors. On the 6th day of October, 1876, he added a codicil to this will, by which he directed the manner in which certain of said legacies were to be paid, and the funds kept invested. On the 5th of October, 1878, he executed a second codicil to the will, by which he appointed William J. Parker as an additional executor. On the 16th of December, 1878, Mr.

Parker, in the presence of two witnesses, subscribed a paper purporting to renounce his appointment as executor, and all right to act as such. At the same time, Mr. Field's three daughters, Mrs. Beers, Mrs. Staunton and Mrs. Ely, executors named in the will, signed an agreement whereby, in consideration of Mr. Parker's relinquishing the right to act as such executor, they promised that he should "be employed in the settlement of the estate, and should receive ample remuneration therefor." On the 27th day of January, 1879, Mr. Field died, at the age of nearly ninety-two years. Mr. Field, before his death, had refused to revoke the appointment, as an executor, of Mr. Parker who, at the time of his appointment, had signified his acceptance of the trust. When informed of the proposed renunciation by Mr. Parker, Mr. Field vehemently opposed it. On the 31st day of January, 1879, Mr. Parker delivered to Mrs. Beers, Mrs. Staunton and Mrs. Ely, and on the 30th to the surrogate, a paper subscribed by him, purporting to retract the renunciation above referred to. On the 8th day of February, 1879, the will and first codicil were propounded by the executors therein named, and the second codicil by Mr. Parker, all of which were admitted to probate by the surrogate.

*Alfred Ely, J. C. Cochran* and *E. Darwin Smith,* for the appellants.

*John S. Morgan,* for the respondent.

TALCOTT, P. J. :

This is an appeal from the order of the surrogate of Monroe county, admitting to probate the will of Joseph Field, and a codicil thereto, dated October 6, 1876, and also a further codicil, dated the 5th of October, 1878, by which the respondent was appointed an executor. The testator died in January, 1879, at the age of ninety-three years. The appellants are the three daughters of the testator. The three daughters and one other legatee filed allegations against the proving of the second codicil, whereby the respondent was appointed one of the executors, on the ground that the testator was incompetent to make a will at

the date of the second codicil, and alleging undue influence on the mind of the testator, whereby he was induced to appoint the respondent as one of his executors, and also alleging that the respondent is irresponsible and had executed a renunciation of such appointment prior to the death of the testator. And the appellants appeal from so much of the decree of the surrogate as establishes and admits to probate the second codicil.

On the hearing before the surrogate, Dr. Joseph A. Biegler was called as a witness by the appellants, for the purpose of establishing the fact that the testator was of unsound mind and incompetent to make a will at the time of the execution of the second codicil. He had been the attending physician of the testator for eight years previous to the decease of the latter. The examination was interrupted by the counsel for the respondent, in reply to whom he said that what he knew of the condition of Mr. Field was derived from what he observed while he was his attending physician, and that his opinion in regard to the health of Mr. Field was based solely on what he observed while his attending physician.

The respondents' counsel objected to the testimony, under section 834 of the Code of Civil Procedure, and it was excluded by the surrogate. It is assumed that the appellants sought to give evidence, by the testimony of Dr. Biegler, of facts tending to show the unsoundness of the testator's mind at the time of the execution of the second codicil, and also, probably, to introduce the opinion of Dr. Biegler on that subject, founded on his observation of Mr. Field as his attending physician.

The language of the section, on which the objection was based, is as follows :

" A person, duly authorized to practice physic or surgery, shall not be allowed to disclose any information which he acquired in attending a patient in a professional capacity, and which was necessary to enable him to act in that capacity."

It is to be observed that, in this instance, it did not appear that the information sought from Dr. Biegler was information of any facts which was necessary to enable him to act in the capacity of the physician of the testator. It was not the disclosure of any confidential information acquired in his professional capacity, but

of facts which were open to the observation of any person who had seen and conversed with the testator. The provision is, in substance, a re-enactment of a similar provision in the Revised Statutes of 1830.

We have recently had occasion to examine this provision of law, in the case of *Pierson* v. *The People* (18 Hun, 239). In that case, the language of this section of the Code was invoked to prevent the disclosure by a physician of the symptoms exhibited by a deceased person, on the trial of an indictment against Pierson for the murder of the deceased by poisoning. We held, in that case, that the object and intent of the provision of the Code, was the protection of the patient and his representatives against the disclosure of information obtained by a physician in the course of his employment as such, and that it did not prohibit the disclosure of such information when the rejection of the testimony was sought to shield a person charged with the murder of the patient, in a criminal proceeding against the latter for the alleged crime, and that such a case was clearly not within the intent of the statute, and was, therefore, not embraced by it.

The provision in question "is a just and useful enactment to give protection to those who were in charge of physicians from the secrets disclosed, to enable them to properly prescribe for the diseases of the patient. To open the door to the disclosure of the secrets revealed on the sick bed, or when consulting a physician, would destroy confidence between the physician and patient, and it is easy to see might tend very much to prevent the advantages and benefits which flow from this confidential relationship." (*Edington* v. *The Mutual Life Ins. Co.*, 67 N. Y., 185; and see *The People* v. *Ira Stout*, 3 Parker's Crim. Rep., 670, where the reasons for this enactment are fully stated.) The right to exclude the testimony prohibited survives to the representatives *in the premises* of a deceased person. (*Edington* v. *The Mutual Life Ins. Co., supra;* and *Dilleber* v. *The Home Life Ins. Co.*, 69 N. Y., 256.)

By the 836th section of the Code of Civil Procedure it is provided that the provisions of section 834 shall apply to every examination of a person as a witness, unless the provisions thereof are expressly waived by the patient. In this case, the patient being deceased, the

provisions of the section could only be waived by his representatives. The respondent, at the stage of the case before the surrogate, when this evidence was excluded, was a mere stranger to the estate. The evidence was offered in behalf of the heirs at law, who, at that stage of the investigation, appeared to be the only representatives of the deceased in the premises. They, therefore, were the parties who succeeded to the rights of the deceased, and who were competent to waive the provisions of the act. (*Allen* v. *The Public Admr.*; 1 Bradf. Rep., 221, affirmed by the Court of Appeals *sub nom.*; *Thayer* v. *Allen*, Selden's Notes, page 93.)

Wharton, in his work on the Law of Evidence, speaking of the admissibility of the evidence of an attorney concerning matters which have come to his knowledge under the seal of professional confidence, says at section 591 : "The privilege, it should also be remembered, is meant to protect the living in their business relations, and cannot be invoked when the question arises as to the intenton of a deceased person in respect to the disposition of his estate."

In support of such a construction of the statute as will allow this class of testimony to be received in such cases, it is to be remarked that notwithstanding the prohibition of the statute which has existed for nearly half a century, this class of testimony has almost invariably been offered in inquiries relative to the competency of testators, and received without objection, notably in the *Parish Will Case* (25 N. Y., 1); (*Parish Will Case*, vol. II, p. 622, etc.). That was like this, a case involving the competency of a testator, at the time of the execution of a codicil, propounded for proof, and the counsel engaged in the investigation were among the most eminent in the State, yet the testimony of Drs. Edward Delafield and Abram Dubois, who had been his attending physicians, was offered and received without objection, and they gave most important evidence upon the issue, which, it appears, materially influenced the Court of Appeals in the determination of the question of the testator's competency to execute the codicil.

We think the surrogate erred in rejecting the evidence of Dr. Biegler, especially since it did not call for anything which can be supposed to have been communicated under the seal of professional confidence.

As to the question of the renunciation of Mr. Parker, executed prior to the death of Mr. Field, for a consideration, and contrary to the expressed desire of the testator, we fully concur with the opinion of the surrogate*, that the proposed renunciation was invalid and of no legal effect, either as a renunciation or an agreement to renounce *in futuro*.

* The following is the portion of the surrogate's opinion which relates to the point:

"Third. What was the effect of the renunciation, particularly as coupled with the agreement and followed by the retractions?

"It is a familar principle that, under ordinary circumstances, a renunciation of the rights and duties of an executor may be retracted at any time before administration is granted to another. (Dayton's Surrogate, 223; Redfield's Surrogate, 140; *Robertson* v. *McGeoch*, 11 Paige, 640.) The power of retraction is a matter of right, not of mere privilege. (*Casey* v. *Gardiner*, 4 Bradf., 13.) Even after letters testamentary have been issued to one of two executors upon the renunciation of the other, and after an estate is partly settled, if the executor with the letters die, the one who renounced will be allowed to retract his renunciation and take letters testamentary, although the next of kin may object. (*Codding* v. *Newman*, 63 N. Y., 639, 697.) Indeed, our statutes and our courts seem to be opposed to the renunciation, and to favor retraction, for the manifest reason that it is desirable that, so far as may be, trusts shall be administered by those appointed by the creator of the trust. Thus, our statute makes it necessary that a renunciation must be executed in the presence of two witnesses, and with almost as great solemnity as a will itself. (2 R. S., 70, § 8.)

"With an ordinary retraction of a renunciation, nothing of the kind is required. Before our statute, and under the common law, it was necessary for all persons, named in a will as executors, to join in all actions in behalf of the estate, though only one had proved the will and all the others had renounced. (*Watkins* v. *Brent*, 7 Sim., 517; *Webster* v. *Spencer*, 3 B. & Ald., 360; *Bodle* v. *Hulse*, 5 Wend., 313.) Perhaps, for similar reasons, it is still the rule that a person who has once accepted and entered upon the execution of his trust is not ordinarily allowed to resign it. It seems to be conceded that the renunciation, simply as a renunciation, was void in its inception, having been made before the death of Mr. Field; that the will could speak only from the death of the testator, and up to that time no one had any rights under the will to renounce.

"The contestants claim, however, that the renunciation should be read in connection with the agreement for employment, executed at the same time by three of the four executors named in the original will, and that, so read, the two constitute an agreement on the one part not to exercise his rights as executor when those rights accrued, and on the other of employment by those who should be executors. It is, perhaps, not necessary to consider the question now, whether, if Mr. Parker was not then able to execute a valid renunciation, as executor, the others were able to make a valid contract of employment. We will, for the present, assume that the contestant's position is correct, and that the two papers read together constitute such an agreement as they claim, having reference solely to the future probable position and rights of the parties.

But we cannot say but that the evidence proposed to be given by Dr. Biegler, if received, might have been so important as to have produced, in the mind of the surrogate, a result different from that at which he arrived, and, therefore, on account of the rejection of this evidence, the order of the surrogate of Monroe county,

---

"Let us look, for a moment, at the situation of the parties as they were at the time. Mr. Field had made his will, appointing five executors; he had refused to revoke the appointment of one of them — Mr. Parker. Mr. Parker had, at the time of his appointment, signified his acceptance of the trust; when informed of the proposed renunciation by Parker, Mr. Field vehemently opposed it. Nevertheless, and while he was yet alive, this agreement was consummated. An agreement between two applicants for a public office, that one should withdraw and aid the other to obtain the appointment, the fees of the office to be divided between them, is void. (*Gray* v. *Hook*, 4 N. Y., 449.) An agreement between two candidates for an office, that one should withdraw and the other should reimburse him for all his expenses, is void. (*Robinson* v. *Kalbfleisch*, 5 S. C. [T. & C.], 212.) If such agreements are void, as to public trusts, is there any reason why they should not be as to private ones also?

"It has always been held that agreements, on the part of attorneys, to be unfaithful to their clients, of trustees to be unfaithful to their *cestuis que trust*, are absolutely void. Is there anything to take this agreement out of the rule of such cases?

"There is one thing to be constantly borne in mind in this discussion, which these trustees evidently forgot at the time of making this agreement, which trustees are very apt to forget, and that is, that the estate, in regard to which they were bargaining, was *not theirs*. Mr. Field was still alive. This vast estate, which he had struggled so long and successfully to accumulate, was *his*. He had the right to do with it as he pleased, and to appoint to manage it whomsoever he pleased. When these prospective executors undertook to bargain regarding it, they were dealing with what was none of theirs, either as executors or descendants, and they, who had been nominated to be executors of the will, were attempting to supersede and circumvent it. The fact that the agreement was made for a consideration, instead of strengthening it, should condemn it.

"An executor has the undoubted right to renounce, of his own motion, if he desires. But a renunciation for a consideration — a renunciation purchased in any manner, without the concurrence of the testator, and during his lifetime, is a very different matter. If agreements of this nature are to be enforced, then surely testators may well doubt, not only as to who will carry out their wills, but whether they will be carried out at all. To be sure, in this case it may make but little difference who the executors may be, though of that we cannot judge, for Mr. Field may well have had a special and valid reason for the appointment of Mr. Parker. But the principle is the same, whether the difference is little or great; and if the will may be varied by agreement in the lifetime of the testator in a minor respect in this case, it may be varied in an important one in the next, and the door would be thrown wide open to fraud and corruption on the part of designing men and intriguing descendants, and imposition upon confiding testators.

so far as it admits to probate the codicil, bearing date October 5, 1878, is reversed, with costs to the appellants, to be paid out of the estate, and the proceedings are remitted to the surrogate, with instructions for a further hearing as to the validity of the second codicil.

Present — TALCOTT, P. J., SMITH and HARDIN, JJ.

Ordered accordingly.

"The renunciation, then, standing by itself, was, as we have said, and as it is conceded, void in inception. Had it been otherwise, the retraction filed would have restored Mr. Parker's rights under the will. In strictness, therefore, this court, having no power to compel the specific performance of contracts, might have no authority to do other than admit the codicil to probate and issue letters testamentary to Mr. Parker, even if the agreement referred to were, in the estimation of the court valid. But the agreement, being of the kind above intimated, it is unnecessary now to consider the question. Certainly the court would not feel bound to strain its authority to enforce such an agreement. Had it full authority, it would be its duty to 'take advantage of any fair circumstances to avoid making a decree for the specific performance of a contract by trustees, when the execution of it would constitute a breach of trust.' (Jeremy's Eq. Jur., 451.) Assuming, therefore, all that is claimed for the papers in question, they seem only to form a contract which would be void as against public policy, and looking at the questions presented in all their aspects, there seems to be no reason why the second codicil should not be admitted to probate with the will, and it is so ordered."