fastened and held in place by screws, and can be moved without injury to the real estate. It was properly held by the commissioners to be personal property.

The appellant also claims that the finding of the referee that the respondent had been unable to agree with the appellant for the purchase of the strip of land, although it had made efforts so to do, was not warranted by the evidence. The proof was that, prior to the proceedings being instituted, respondent's agent had several conversations with appellant's president, who was the owner of a majority of the stock, regarding the purchase of the strip of land, exhibiting a map of the property desired, and was told that the company would not consider any proposition to sell a part, but would sell the whole of the premises for $35,000, and that he would make no price on a part. Later an offer to purchase was served upon the president of appellant, and later another offer was left at the office of appellant with the bookkeeper in charge, to which no response was made. I think the finding referred to was warranted, and that the award was ample. There are no exceptions calling for a reversal of the order appealed from.

The interlocutory judgment and final order should be affirmed. All concur.

---

(161 App. Div. 404)

LOGAN v. FIDELITY–PHENIX FIRE INS. CO. OF NEW YORK.

(Supreme Court, Appellate Division, Second Department. March 20, 1914.)

1. CORPORATIONS (§ 432*)—OFFICERS—BORROWING SECURITIES—AUTHORITY.

Where the president of an insurance company, without authority conferred by the board of directors, borrowed certain corporate stock from plaintiff, giving therefor a receipt reciting that the stock was borrowed for the account of the insurance company to be returned on demand, signed as president, such receipt was not conclusive as to whether the transaction was for the benefit of the insurance company or of the president individually.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1717, 1718, 1724, 1726–1735, 1737, 1743, 1762; Dec. Dig. § 432.*]

2. CORPORATIONS (§ 413*)—ACTS OF PRESIDENT—BORROWING SECURITIES—AUTHORITY.

A by-law of an insurance company, declaring that the president shall have special supervision and care over the property and concerns of the company, did not authorize him to borrow securities to conceal his own defalcation, and make the company responsible for the return thereof.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1647–1649; Dec. Dig. § 413.*]

3. CORPORATIONS (§ 425*)—AUTHORITY OF PRESIDENT—BORROWING SECURITIES—ESTOPPEL.

The president of an insurance company had no implied authority to borrow securities from a director, ostensibly to retire certain reinsurance risks, but in fact to cover his own defalcations, and, having done so, the corporation was not estopped to deny the existence of any such authority.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1697–1701, 1705; Dec. Dig. § 425.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

4. Contracts (§§ 131, 138*)—Illegality—Enforcement—Loan of Securities
   for Illegal Purpose.

    Where plaintiff, a director of an insurance company and a member of
the committee of accounts whose duty it was to examine the corporation's
assets and securities at least every six months, loaned certain corporate
stock to the president, on his representation that it was to deceive the
insurance commissioner, while it was in fact to conceal his own defalca-
tions consisting of a sale of certain bonds belonging to the corporation,
which would have been discovered had plaintiff made the proper examina-
tion of the company's assets and securities, plaintiff was chargeable with
notice of such defalcation, and, being unable to prove his claim against
the corporation without proving his illegal agreement with the president,
was not entitled, after the president's death, to recover against the cor-
poration for its alleged conversion of securities by reason of its refusal to
return the same.

    [Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 594–607, 681–
700; Dec. Dig. §§ 131, 138.*]

    Appeal from Trial Term, Kings County.

    Action by William J. Logan against the Fidelity-Phenix Fire In-
surance Company of New York. From a judgment for plaintiff and
from an order denying defendant's motion for a new trial, it appeals.
Reversed and remanded.

    Argued before JENKS, P. J., and BURR, THOMAS, CARR, and
RICH, JJ.

    I. R. Oeland, of Brooklyn, for appellant.

    John D. Fearhake, of New Canaan (James M. Gifford, of New
York City, on the brief), for respondent.

    BURR, J. Plaintiff alleges that on October 27, 1909, he was the
owner of 1,400 shares of stock of the American Sugar Refining Com-
pany; that at that time he loaned it to the Phenix Insurance Com-
pany (to whose obligations defendant has succeeded), to be returned
on demand; and that on December 18, 1909, he demanded the return
of said stock, which was refused. In an action for conversion he has
recovered a verdict for $198,375, the value of said stock. From a
judgment entered thereon, and from an order denying a motion for
a new trial, this appeal is taken.

    The crucial question is: To whom was this stock loaned? Was
it loaned to the insurance company to be used for its lawful purposes,
or was the transaction a personal one between plaintiff and one
George P. Sheldon? There is no substantial conflict of evidence. The
material facts are as follows:

    On October 27, 1909, Sheldon was president of the Phenix In-
surance Company, and had been for 20 years. Plaintiff was one of
its board of directors, and had been for about 12 years, and was
Sheldon's intimate friend. Plaintiff was on the date named, and for
several years had been, a member of the accounts committee, of the
executive committee, and of the finance committee of said board. In
January, 1908, Sheldon caused to be entered upon the books of the in-
surance company a list of stocks and bonds which he claimed to
have bought on its account, of the value in the aggregate of $489,-

*For other cases see same topic & § number in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

576.67.. These were thereafter included in its statement of assets. As matter of fact, no such purchase had been made. There came a time when Sheldon must produce the securities or his fraud would be detected. Accordingly, in January, 1909, stocks and bonds of the character and·value indicated by the entries in its books were purchased, but in the meantime these had advanced in price to $622,-611.95, so that to purchase the same required an additional expenditure, plus interest on the adjustment, of nearly $140,000. This amount Sheldon must in some way make good. To accomplish this he directed the brokerage firm of Fiske & Robinson to sell for account of the company, New York City 3½ per cent. bonds of the par value of $200,000. Such sale was made, and the company given credit therefor in the sum of $180,000, upon a statement issued by said firm February 28, 1909. Although these bonds were taken from the box containing the company's securities, the sale thereof was never entered upon its books; but they were still included in the list of its assets.

In October, 1909, the representatives of the insurance department began an examination of the affairs of the company. It was inevitable that before the completion of this examination the loss of the New York City bonds would be detected, and it was again necessary for Sheldon to take some steps to conceal his fraudulent conduct. The account between Fiske & Robinson and the company as it appeared upon their books, and upon said statement of February 28, 1909, then sent to the company's office, showed among other transactions the sale of the New York City bonds on January 12, 1909. Crediting the company with the proceeds of this sale at $180,000, and at the close of February in that year there was due it upon this and other transactions as to which there seems to be no question the sum of $52,596.46. This balance∘ was continued without change except by way of interest adjustments until April 2, 1909, when the company made a cash deposit with said firm of $75,000, and the balance thus created continued without change until September 30th of that year. At this time the surplus arising from the sale of the city bonds, plus the cash deposit of $75,000, plus interest on balances, amounted to $121,541.30. No change was made in said account until October 28, 1909. Two or three days before that time, Sheldon seems to have realized that the first step necessary to take was to procure a change in the form of this account. To make it correspond with the books of his company, it should have only shown a balance equal to the sum of $75,000 deposited April 2, 1909, with interest from that date, and it should not have shown any sale of New City bonds on January 12, 1909. Between October 25th and October 28th there were two or three interviews between Mr. Sheldon and Mr. Robinson of that firm on the subject, and at least one letter was written by Sheldon. In substance, Sheldon proposed to Fiske & Robinson to "remodel" the account so as to cancel the sale of New York City bonds, to return the bonds to the company, and to omit the credit balance resulting from such sale. Fiske & Robinson agreed to thus readjust the account. While the cancellation of the sale of said bonds reduced the credit balance of the company to just exactly the sum of

$75,000 and accrued interest, the return of the bonds would have made a debit balance arising out of this item which, with interest, amounted to $138,542.23. This sum Sheldon undertook to pay, and did pay as hereinafter set forth, and, upon receiving the "remodeled" statement, he sent his personal check for that sum, dated October 28, 1909, to Fiske & Robinson, and said firm delivered to the secretary of the company the 200 Dock bonds. In reality, Sheldon bought the bonds back and restored them to the treasury of the company. The company was then actually in possession of its bonds, as its own books during that entire period falsely stated was the fact, and its statement of account with Fiske & Robinson upon its face might not be criticised for variance from its books.

How did Sheldon obtain the money necessary to make this large payment of $138,542.23? On October 26, 1909, he went to the plaintiff and, after telling him that the insurance examiners were then at work, he falsely stated to him in substance that there was entered upon the books of the company a large item for reinsurance of the risks of another company. If that were allowed to remain, he added :

"I am afraid that our surplus might get down so we will have to drop out the 20 per cent. dividend; but, if I could get that reinsurance we took on out of the way, it will be all right."

The plan was to place this reinsurance with some other company and take the item from the Phenix books. To accomplish this it would seem to be necessary to pay the premium of such reinsurance. If this were done, it would, of course, deplete the cash in the treasury of the Phenix Company by just that amount. Whether that would be sufficient to so reduce the surplus that a dividend of 20 per cent. upon the stock, which for some time previously thereto had been paid (see Insurance Law, Consolidated Laws, c. 28 [Laws of 1909, c. 33, as amended Laws of 1909, c. 301] §§ 22 and 78), would be no longer permissible under the law, does not clearly appear; but both parties seemed to be apprehensive of this. If the arrangement to retire this reinsurance was merely a temporary one, for a few days only, as Sheldon stated it would be, and accomplished by cash furnished elsewhere than from the insurance company's treasury, and if this reinsurance was taken back as soon as the examiners had departed, the loss, if any, would be relatively small. Plaintiff asked Sheldon how much cash he would require for this purpose. He promised to let him know the next day. The next day Sheldon told him that he would require $145,000. Plaintiff told him that he did not have that much money, but he added, "I can give you some securities, and you can borrow on them." Therefore, on October 27th, he gave to Sheldon 14 certificates, of 100 shares each, of the stock of the American Sugar Refining Company, indorsed for transfer, and Sheldon gave him a receipt in the following form:

"New York, October 27, 1909.

"Received of Mr. Wm. J. Logan fourteen hundred (1,400) shares of Am. Sugar Refining Co. com. stock for acct. of Phenix Insurance Co., to be returned upon demand.                    George P. Sheldon, President."

Sheldon took this stock, went to the office of Carter, Wilder & Co., another firm of brokers, hypothecated it with them, and obtained their check for $145,000. This check he deposited to the credit of his personal account in the Liberty National Bank. He was thus enabled, upon the succeeding day, when the transactions above referred to with Fiske & Robinson were completed, to give them his certified personal check for $138,542.23, the balance due to them on the "remodeling" of the account with the insurance company. There still remained about $8,000 to Sheldon's credit with the Liberty National Bank after payment of this check. A portion of this was drawn by him in his lifetime, and none of it, so far as appears, was ever received by defendant. Within a few days thereafter Sheldon was seized with a fatal illness, and on December 25, 1909, he died. The stock hypothecated with Carter, Wilder & Co. was subsequently sold, and the surplus above the amount necessary to discharge the loan was paid to Sheldon's estate.

[1] The fact that the receipt delivered to plaintiff at the time that the stock was delivered to Sheldon is in form a receipt by the insurance company is not conclusive as to the transaction. Baker v. Union Mut. Life Ins. Co., 43 N. Y. 283. Even if the corporate seal had been affixed thereto, it would at most only have been prima facie evidence that it was affixed by proper authority, and would have imposed upon the party objecting thereto to show that it was affixed surreptitiously or improperly. Quackenboss v. Globe & R. S. Ins. Co., 177 N. Y. 71, 69 N. E. 223. No authority by direct action of the board of directors of the insurance company to Sheldon, its president, to borrow either money or securities, was proved, if indeed under the circumstances here disclosed such action would have been sufficient to impose obligation upon the defendant.

[2] Respondent seems to rely for express authority upon a by-law of the company defining the duties of its president, which, among other things, imposed upon him the duty "to have a special supervision and care over the property and concerns of the company." It would certainly be a strange use of the words "supervision" and "care" to hold that this by-law would permit the president, in order to conceal his own defalcation, to borrow either money or securities upon the credit of the company, and make it responsible for the return thereof.

[3] Neither is there any evidence of implied authority to borrow, nor is the defendant estopped from denying, under the circumstances here disclosed, the existence of such authority. In this case we have a director dealing with his own corporation. He is chargeable with such knowledge as to its affairs as he actually possessed, or which in the discharge of his duties he should have had. Ward v. City Trust Co., 192 N. Y. 61, 84 N. E. 585; Syracuse Savings Bank v. Merrick, 182 N. Y. 387, 75 N. E. 232.

[4] Plaintiff admitted that he knew that it was his duty as a director "to look after the assets of the company." The duty imposed upon him by the by-laws as one of the committee of accounts was "to audit the books and accounts of the secretary, and examine the assets and securities of the company at least once in every six months, and

report the condition thereof to the board of directors." If that duty had been faithfully discharged during the year 1908, it is difficult to see how it could have escaped attention that entered upon the books of the company was a long list of bonds and stocks purporting to be its property, which an examination of its "assets and securities" would disclose had nothing corresponding thereto in the company's strong-box. Although it was the duty of said committee, including plaintiff, to make such examination of assets and securities on the 1st of January and July in each year, this duty was entirely neglected in July, 1909. If it had been faithfully performed, plaintiff must have discovered that the $200,000 of New York City bonds, which was enumerated among the company's assets, was not in fact in its possession. As it was the duty of the finance committee, of which he was also a member, "to direct the sale and transfer of any stocks belonging to the company," he was chargeable with knowledge that the sale of these securities had never been authorized. Accurately speaking, it is true that these were not "stocks," but bonds. But inasmuch as the finance committee was "to take charge of the funds of the company," it was at least within the spirit of this by-law to impose upon this committee the duty of authorizing the sale and transfer of all securities, whether technically described as stocks or bonds. It is conceded that the statement of Sheldon that there was upon the books of the company an item of "reinsurance," which would reduce its surplus, was false, and an examination of the books would have instantly disclosed that. If plaintiff, with actual knowledge of all of these facts, had put Sheldon in possession of his Sugar Refining Company's stock, it is difficult to see upon what theory defendant was bound to return the same. It is apparent that they were not borrowed for its use. His means of knowledge and his duty to acquire knowledge place him in the same position as if he had had actual knowledge. Ward v. City Trust Co., supra; Syracuse Savings Bank v. Merrick, supra.

Unless defendant was bound to return him his stock on demand, it cannot be held liable in an action for conversion, for only out of such obligation and a refusal of compliance can conversion arise. Chankalian v. Powers, 89 App. Div. 395, 85 N. Y. Supp. 753. In addition, plaintiff knew that in September, 1909, when he moved the adoption of a resolution for the payment to the stockholders of a dividend of 5 per cent. on the capital stock of defendant, it had on hand, in addition to stocks and bonds amounting to several millions of dollars, cash in excess of $800,000. Under such circumstances he was at least put upon his inquiry as to why he should be called upon to loan to the company his securities to enable it to raise cash thereon to dispose of its reinsurance account, instead of using its own cash and securities for that purpose. The only possible explanation is the one offered, that the loan was to carry out a secret agreement between Sheldon and himself to at least mislead the representatives of the insurance department in the examination which they were then making. If the cash and securities of the company were used for the purpose of getting rid of this item of reinsurance, its assets would by just so much be reduced, and consequently its surplus. If his securities were to be used for

that purpose upon an open and recognized loan thereof by him to the company, the books of the company must show a liability to him equal to the amount of the loan, and again by just so much would its liabilities be increased and its surplus correspondingly reduced. Plaintiff did not at that time disclose the fact of this loan to any of his fellow directors, and the only inference to be drawn from the transaction is that this loan was not to be entered upon the books of the company, and to that extent said books would not represent the true state of its affairs, and to the same extent the examiners would be misled. This was not only against good morals, but in express violation of the duty imposed upon him as one of the directors of the company.

"A director * * * of any corporation * * * who * * * makes or concurs in making any false entry, or concurs in omitting to make any material entry in its books or accounts, * * * is guilty of a misdemeanor." Penal Law (Consol. Laws 1909, c. 40) § 665.

"The superintendent of insurance shall, as often as he deems it expedient, examine into the affairs of any insurance corporation doing busines in this state, * * * and the officers and agents of such corporation shall facilitate such examination and aid the examiners in making the same so far as it is in their power to do so." Insurance Law, supra, § 39.

The purpose of such examination is to obtain accurate information as to the affairs of the company in the interest of the stockholders, its policy holders, and the public who might deal with it. Can a director be said to facilitate such examination and to aid the examiners, who connives at the omission to make material entries in the books of said company as to its liabilities for the sake of creating a fictitious surplus?

"All contracts or agreements which have for their object anything which is repugnant to justice, or against the general policy of the common law, or contrary to the provisions of any statute, are void." Bell v. Leggett, 7 N. Y. 176; Wheeler v. Russell, 17 Mass. 257, on page 281.

While it is true that an agreement will be enforced even if it is incidentally connected with an illegal transaction, provided that it is supported by an independent consideration, and the plaintiff does not need the aid of the illegal transaction to make out his case (Gray v. Hook, 4 N. Y. 449; Woodworth v. Bennett, 43 N. Y. 273, 3 Am. Rep. 706; Dennehy v. McNulta, 86 Fed. 825, 30 C. C. A. 422, 41 L. R. A. 609; National Distilling Co. v. Cream City Importing Co., 86 Wis. 352, 56 N. W. 864, 39 Am. St. Rep. 902; Minnesota Lumber Co. v. Whitebreast Coal Co., 56 Ill. App. 248; Washington Irrigation Co. v. Krutz, 119 Fed. 279, 56 C. C. A. 1), such is not the case where the party does require aid from the illegal transaction to establish his claim (Gray v. Hook, supra; Woodworth v. Bennett, supra; Materne v. Horwitz, 101 N. Y. 469, 5 N. E. 331).

In the case at bar, the loaning agreement was not made with the express purpose of enabling defendant to repossess itself of its securities of which it had been defrauded by Sheldon. To prove his debt, plaintiff had to show the improper transaction out of which the obligation to return the stock grew. It seems to us that, even if the directors of the company had expressly authorized the making of the agreement which plaintiff asserts was made, defendant could not, within the authorities above cited, be held thereon in conversion for a fail-

ure to return said stock. The respondent contends that, because the proceeds of plaintiff's securities were in fact used by Sheldon to buy back and restore to defendant property which he had purloined from it, defendant thereby became responsible for his agreement to return these securities on demand. The conclusion does not follow from this fact alone. The case of Atlantic Cotton Mills v. Indian Orchard Mills, 147 Mass. 268, 17 N. E. 496, 9 Am. St. Rep. 698, greatly relied upon by respondent, is clearly distinguishable from the case at bar. In that case one Gray was the treasurer of both corporations. He had embezzled money from the plaintiff. To cover this deficiency, he took money from defendant's treasury and paid it into plaintiff's treasury, and it was held that plaintiff could not retain it. But the vital distinction is that in that case plaintiff came into possession of the money "through the act of no person other then Gray himself." In that case defendant did not voluntarily part with its funds for any purpose. In the case at bar, plaintiff did. Whether his securities could be reached in an action in equity to trace assets to which all those connected with the transaction should be parties, we need not now determine. This is an action at law, and aside from the fact that Sheldon had no authority, express or implied, to borrow plaintiff's stock for the purposes of the company, the contract of borrowing is so connected with and dependent upon an illegal transaction that the whole of it, including the promise to return, is unenforceable.

We are of opinion that at the close of the entire case the complaint should have been dismissed. Within the authority now conferred upon us, instead of ordering a new trial, we direct that the judgment and order appealed from be reversed, and the complaint dismissed, with costs of the action and of this appeal.

JENKS, P. J., and CARR and RICH, JJ., concur. THOMAS, J., concurs upon the ground that the bonds were loaned for an illegal purpose in which the plaintiff knowingly participated.

