EMMA ST. JOHN, Plaintiff, *v.* JAMES N. CROCKER, Defendant.

Supreme Court, Saratoga County, January 15, 1935.

*Frank A. Crawford,* for the plaintiff.

*Butler, Kilmer, Hoey & Butler* [*W. P. Butler* of counsel], for the defendant.

BREWSTER, J.   The complaint is for a *quantum meruit* recovery for certain conduct of and services performed by plaintiff pursuant

to an oral contract, the substance whereof is alleged as follows: that plaintiff agreed with defendant that she would " cease the activities in which she was then engaged in an investigation of the gambling situation in the City * * * of Saratoga Springs, New York, and devote her entire time and attention to a program and investigation then being carried on by the defendant pertaining to the alleged misconduct of certain duly elected public officials; * * * transfer her activities and what evidence she had secured to the defendant and his agents and assist defendant's agents in the proceedings aforementioned; * * * work for him under his plan of campaign, * * * abandon her investigation and plans." It is also alleged that when this contract was made " defendant stated to plaintiff that it was important that he should not be known publicly to be connected with this investigation. That the plaintiff herein must appear to be the person making the complaint of alleged misconduct in office against the public officials." (Complaint, pp. 1, 2.) It is alleged that for her conduct and service, as afore-stated, defendant agreed that he " would pay to the plaintiff herein a handsome remuneration and, in the event that the defendant herein was successful in removing from office " a certain then incumbent, that he " would secure for the plaintiff a position." (Complaint, p. 2.)

That the agreement sued upon transcends the limitations set for legal contract by considerations of general public policy, is, to me, plainly obvious.

The tenor and language of the pleading compels the inference that the " position " defendant was to secure plaintiff as a part of the reward for the performance of her part of the agreement, was a public office or position having something to do with the function of government. This part of the consideration of the contract, then, involved a traffic in public office or position which for centuries has been condemned by the courts. It is a matter that is flagrantly counter to and subversive of our form of government. It is forbidden. It is illegal. Forming as it does a component part of the consideration relied upon to support the questioned agree-ment, its legal iniquity permeates the entire contract and renders it wholly bad and unenforcible. (*Haynes* v. *Rudd,* 102 N. Y. 372; *Saratoga County Bank* v. *King,* 44 id. 87; *Rose* v. *Truax,* 21 Barb. 361; *Metz* v. *Woodward-Brown Realty Co.,* 182 App. Div. 60; *Hazelton* v. *Sheckells,* 202 U. S. 71.)

If for any reason, on a motion of this kind, the inference of the vice of an attempted traffic in public office be considered too violent, we find other barriers that prevent an enforcement of the pleaded contract.

We must assume that the "investigation and plans" in which plaintiff says she was engaged, when the defendant made his proposal to her, were lawful, in design and execution. These she agreed to cease and abandon for the promise of a handsome remuneration and a position contingent on the success of a certain phase of defendant's venture. The contract thus lured her away from the high duties of citizenship in which she was then engaged. It called for an abandonment of "her own investigation and plans." It involved a sale of the evidence she had procured. It called for the surrender of her public spirit as a complaining citizen to the dictation and leadership of the defendant, he, thereafter, to be her undisclosed principal and she his paid advocate, agent and representative. Public policy forbids such a barter in civic virtue. (American Law Institute, Restatement Law of Contracts, § 553 et seq.; Riggs v. Ryan, 121 App. Div. 301.)

It is my opinion that the contract which plaintiff tenders is also void as against public policy for another reason, viz., its performance entailed a fraud upon the government. In the specification of her labors which plaintiff alleges she performed and for which she asks that the defendant be compelled to pay, she alleges that she twice made complaint to the Governor asking for the removal of certain public officials. The executive branch of the government alone had power to remove them on such a complaint. She appeared there in pursuance of the performance of her contract with the defendant. For those services she was acting for the reward of the promised handsome remuneration and a possible position. By other stipulations of that same agreement, she was then falsely appearing publicly in the role of an outraged citizen honestly endeavoring at reform at the sole instance of her public spirit. Any contract that thus encompasses or designs at such deception upon a branch of the government is patently against public policy. When the Governor received her complaint, it was imperative that she appear in a true light, and with frankness, candor and in all honesty, and not as an actress pretending in the role of indignant citizenship, because of promise of pay secretly secured. We find this analysis, applicable to her conduct, well stated by the Court of Appeals many years ago (1851), in *Gray* v. *Hook* (4 N. Y. 449) and in the following language (at p. 456): "Every citizen owes to his government and all its officers while executing their official duties, truth and fidelity. All the actions of government and its officers are based upon certain facts, assumed, or proved, and falsehood and deception in reference to those facts are moral wrongs, injurious to the whole state, whose government it is, and therefore against public policy. The strength,

durability and prosperity of our political institutions depends entirely on the intelligence, integrity and faithful support of the people. No citizen can, therefore, legally stipulate to embarrass the operations of government, by diminishing its means to execute its powers." Again, and as long ago as 1853, the Supreme Court of the United States declared: "public policy and sound morality do therefore imperatively require that courts should put the stamp of their disapprobation on every act, and pronounce void every contract the ultimate or probable tendency of which would be to sully the purity or mislead the judgments of those to whom the high trust of legislation is confided. * * * Where persons act * * * in any representative capacity, it is due to those before whom they plead or solicit, that they should honestly appear in their true characters, so that their arguments and representations, openly and candidly made, may receive their just weight and consideration. A hired advocate or agent, assuming to act in a different character is practicing deceit. * * * Advice or information flowing from the unbiased judgment of disinterested persons, will naturally be received with more confidence and less scrupulously examined than where the recommendations are known to be the result of pecuniary interest, or the arguments prompted and pressed by hope of a large contingent reward, or the agent 'stimulated to active partisanship by the strong lure of high profit.' Any attempts to deceive persons intrusted with the high functions of legislation, by secret combinations, or to create or to bring into operation undue influences of any kind, have all the injurious effects of a direct fraud on the public * * * and courts of justice can give no countenance to the use of means which may subject them to be misled by the pertinacious importunity and indirect influences of interested and unscrupulous agents or solicitors." (*Marshall* v. *Baltimore & Ohio R. R. Co.*, 57 U. S. [16 How.] 314, 333, 334.)

What was thus said as to representation before a Legislature must apply with equal or greater force to representation before the executive branch of the government, headed by a single individual. The thought above expressed finds further statement in *Trist* v. *Child* (88 U. S. [21 Wall.] 441, at p. 450), viz.: "There is a correlative duty resting upon the citizen. In his intercourse with those in authority, whether executive or legislative, touching the performance of their functions, he is bound to exhibit truth, frankness, and integrity. Any departure from the line of rectitude in such cases is not only bad in morals, but involves a public wrong. No people can have any higher public interest, except the preservation of their liberties, than integrity in the administration of their government in all its departments."

Again, in *Metz* v. *Woodward-Brown Realty Co.* (*supra*, at p. 64), we find this statement: " There is a marked distinction between the service of an avowed agent openly performed in dealing with governmental agencies, and the forbidden case of interference * * * by a party who does not profess to act on commercial principles." (Citing *Lyon* v. *Mitchell*, 36 N. Y. 235.)

That the plaintiff may have been conscious of no wrong when she made the forbidden bargain with the defendant, or that she may have been impelled to do so mostly by worthy motives, does not help her case, for, as was stated in *Mills* v. *Mills* (40 N. Y. 543): " It is not necessary to adjudge that the parties stipulated for corrupt action, or that they intended that secret and improper resorts should be had. It is enough that the contract tends directly to those results. It furnishes a temptation to the plaintiff, to resort to corrupt means or improper devices, to influence " government.

Defendant's motion for judgment on the pleadings for a dismissal of the complaint is granted.