# Court of Appeals.

Oct. 11, 1898.

## PEOPLE v. SAMUEL K. HAWKINS.

1. CONSTITUTIONAL LAW—CONVICT-MADE GOODS.

The principle, embodied in the constitutional guaranty that the citizen cannot be deprived of his property without due process of law, is not limited to the physical taking of property. Any law which annihilates its value, restricts its use, or takes away any of its essential attributes, comes within the purview of this limitation upon legislative power.

**2. SAME.**

The legislature, under the guise of the police power, cannot regulate the price of labor by depressing, through the penalties of the criminal law, the price of goods made by another class.

**3. SAME.**

Chapter 931 of 1896 is in conflict with the constitution of this state, since it interferes with the right to acquire, possess, and dispose of property, and with the liberty of the individual to earn a living by dealing in the articles embraced within the scope of the law.

**4. SAME.**

Section 29, art. 3 of Constitution, 1894, does not forbid the sale of prison-made goods to the general public.

**5. SAME.**

This section is in conflict with the commerce clause of the federal constitution.

**6. SAME.**

When such laws operate as burdens or restrictions upon the freedom of trade or commercial intercourse, they are invalid.

**7. SAME.**

A citizen of this state who happens to buy goods made in a prison in Ohio has the right to put them upon the market here on their own merits, and if this right is restricted by a penal law, while the same goods made in factories are untouched, such a law is a restriction upon the freedom of commerce, and the objection to it is not removed by the fact that it may have been enacted in the guise of a police regulation.

APPEAL from a judgment of the appellate division affirming a judgment entered on a decision sustaining a demurrer to the indictment.

Harry C. Perkins, for the People.

Frederick Collin, for respondent.

O'BRIEN, J.—The defendant was indicted for a misdemeanor, the charge being that he violated chapter 931 of the Laws of 1896, relating to the labeling and marking of convict-made goods of articles. The indictment alleges that the defendant on the 5th day of November, 1896, had in his possession and offering for sale, unlawfully and with criminal intent, a certain scrub brush of the form, style, and material commonly used in

scrub brushes, but made and manufactured, as the defendant well knew, by the labor of convicts lawfully sentenced to and confined in a prison at Cleveland, Ohio. It then charges that this article was brought from that institution into this state, and was in the defendant's possession, for the purpose of sale, without having upon it in any manner the words " Convict-Made," or any words indicating in any manner that it was manufactured by convict labor. The defendant demurred to the indictment upon the ground that the facts stated did not constitute a crime, and the courts below have sustained the demurrer for the reason that the statute was in conflict with the constitution, and therefore void. The statute went into effect by its terms on November 1, 1896, and the several sections material to the questions in the case are as follows :

" Section 1. All goods, wares and merchandise made by convict labor in any penitentiary, prison, reformatory or other establishment in which convict labor is employed shall, before being sold, or exposed for sale, be branded, labeled or marked as hereinafter provided, and shall not be exposed for sale in any place within this state without such brand, label or mark.

" Sec. 2. The brand, label or mark hereby required shall contain at the head or top thereof the words ' Convict Made,' followed by the year and name of the penitentiary, prison, reformatory or other establishment in which it was made, in plain English lettering, of the style and size known as great primer Roman condensed capitals. The brand or mark shall in all cases, where the nature of an article will permit, be placed upon the same, and only where such branding or marking is impossible shall a label be used, and where a label is used it shall be in the form of a paper tag, which shall be attached by wire to each article, where the nature of the article will permit, and placed securely upon the box, crate or other covering in which such goods, wares or merchandise may be packed, shipped or exposed for sale. Said brand, mark or label shall be placed upon the outside of and upon the most conspicuous part of the finished article and its box, crate or covering."

" Sec. 5. Section three hundred and eighty-four b of the Penal Code is hereby amended so as to read as follows : Sec-

tion 384 b. Penalty for dealing in convict-made goods without labeling.—A person having in his possession for the purpose of sale, or offering for sale, any convict-made goods, wares or merchandise hereafter manufactured and sold, or exposed for sale, in this state without the brand, mark or label required by law, or removes or defaces such brand, mark or label, is guilty of a misdemeanor, punishable by a fine not exceeding ten hundred dollars not less than one hundred dollars, or imprisonment for a term not exceeding one year nor less than ten days, or both."

The act charged against the defendant, and which is admitted by the demurrer, is declared to be a crime by this statute, and the only question that we need consider is whether the legislature had any power, under the constitution, to enact such a law. The law is similar in all respects to the law of 1894 (chapter 698, Laws 1894), except that the latter statute was aimed at prison-made goods of other states, while the present statute applies to all prison-made goods, whether of this or other states. The act of 1894 was held to be unconstitutional and void. People v. Hawkins, 85 Hun, 43, 32 N. Y. Supp. 524. The present act makes it a criminal offense to expose for sale prison-made goods of this state as well as of other states. It seems to have been assumed that the feature of the former act, which discriminated against the prison-made goods of other states, was the only objection to this class of legislation. But the broader scope of the present law removes no objection that existed to the former. On the contrary, it multiplies and intensifies them.

It is important at the outset to ascertain, if we can, the legislative purpose and intent that led to the enactment of this law. The learned district attorney, in his brief in the court below, has, I think, stated it quite fairly and accurately in these words : " The statute in question is an attempt to solve a great public and economic problem. It has a bearing, directly or indirectly, upon wages paid to workmen in certain lines of industry. * * * It involves the welfare and prosperity of the laboring classes, who comprise a great portion of our population. * * * It is against sound public policy to compel workmen who have to support their families by their daily earnings to compete

with the unpaid labor of convicts in penal institutions. The framers of the state and federal constitutions never intended to create and foster such competition. The people have a right to demand protection from the legislature in this respect, and it is within the police power of the state to require the mark, brand, or label of goods made in penal institutions." We may assume, therefore, that the purpose of the law was to promote the welfare of the laboring classes by suppressing, in some measure, the sale of prison-made goods. Waiving for the present the question whether the means employed can ever, in the nature of things, accomplish the end in view, it is quite clear that unless this statute in some degree affects the value of certain articles of merchandise by restricting the demand or imposing conditions upon the right to deal in them as property, in order to exclude them from the market, it is a mere brutum fulmen. The scrubbing brush in question was beyond all doubt an article of property in which the defendant could lawfully deal. He is forbidden, however, by this statute, under all the penalties of the criminal law, from buying or selling or having it in his possession, except upon the condition that he shall attach to it a badge of inferiority, which diminishes the value and impairs its selling qualities. It is not claimed that there is any difference in the quality of this scrubbing brush when compared with one of the same grade or character made outside the prisons. There is no pretense that the act was passed to suppress any fraudulent practice, or that any such practice existed with respect to such goods. The validity of the law must depend entirely upon the exercise of the police power to enhance the price of labor by suppressing, through the instrumentality of the criminal law, the sale of the products of prison labor.

The citizen cannot be deprived of his property without due process of law. The principle embodied in this constitutional guaranty is not limited to the physical taking of property. Any law which annihilates its value, restricts its use, or takes away any of its essential attributes, comes within the purview of this limitation upon legislative power. The validity of all such laws is to be tested by the purpose of their enactment,

and the practical effect and operation that they may have upon property. A law which interferes with property by depriving the owner of the profitable and free use of it, or hampers him in the application of it for the purpose of trade or commerce, or imposes conditions upon the right to hold or sell it, may seriously impair its value, against which the constitution is a protection. The fact that legislation hostile to the rights of property assumes the guise of a health law or a labor law will not save it from judicial scrutiny, since the courts cannot permit that to be done by indirection which cannot be done directly. The guaranty against depriving the citizen of his liberty comprehends much more than the exemption of his person from all unlawful restraint. It includes the right to engage in any lawful business, and to exercise his faculties in all lawful ways in any lawful trade, profession, or vocation. All laws, therefore, which impair or trammel these rights, or impose arbitrary conditions upon his right to earn a living in the pursuit of a lawful business, are infringements upon his fundamental rights of liberty, which are under constitutional protection. These rights may, doubtless, be affected to some extent by the exercise of the police power, which is inherent in every sovereign state. But that power, however broad and extensive, is not above the constitution. The conduct of the individual and the use of property may be affected by its lawful and proper exercise in cases of overruling necessity, and for the public good. The preservation of public order, the protection of the public health and the prevention of disease, the sale of articles of unwholesome or adulterated food, the calamities caused by fire, and perhaps other subjects relating to the safety and welfare of society, are within its scope. But no law which is otherwise objectionable as in conflict with the fundamental guaranties of the constitution can be upheld under the police power, unless the courts can see that it has some plain or reasonable relation to those subjects, or some of them. These principles have been so fully discussed and sanctioned by judicial authority, and so often asserted, that they may now be regarded as elementary. It is therefore unnecessary to enter the vast field of litigation involving discussions of the police power, and the validity of

statutes enacted really or ostensibly in its exercise. Wyne-hamer v. People, 13 N. Y. 378; In re Jacobs, 98 N. Y. 98; Lawton v. Steel, 119 N. Y. 226, 23 N. E. 878; Forster v. Scott, 136 N. Y. 577, 32 N. E. 976; Colon v. Lisk, 153 N. Y. 188, 47 N. E. 302.

It is entirely safe to assert that no court has yet invoked the police power to justify a statute, the purpose of which was to enhance the wages of labor in certain factories, by suppressing, through the agencies of the criminal law, the sale of competing products made in prisons. If the wages of labor in a few factories producing goods such as are also made in prisons may be regulated by the police power, there is no reason why that power may not be used to regulate the rewards of labor in any other field of human exertion. That all legislation of this character, with this end in view, which subjects the individual to criminal prosecution unless he will comply with regulations in the sale of such goods that are intended to depress their value or demand in the market, is in violation of the Constitution, cannot be doubted. It would be trifling with the Constitution to attempt to uphold this law on the ground that all producers or vendors of goods may be required to tell the truth concerning them, both as to their quality and the means by which or the place where they were manufactured. A knowledge of the truth concerning the origin of every article of property which is the subject of sale, trade, or commerce cannot be essential to the public welfare; and, even if it was, the law could be effective only when applied to all property alike, and not limited to articles made in certain places, and by a certain class of workmen. Any attempt to carry the police power to such an extent as to require the owner of an article of property kept for sale, such as a scrubbing brush, to label it with the history of its origin, and to indicate the place where it was made, and the class of workmen that produced it, and to enforce such regulations by the aid of the criminal law, must be regarded as an inexcusable and intolerable invasion of the rights and liberty of the citizen. There is nothing in the character or effect of prison labor to justify such legislation. The health and welfare of convicts is a subject peculiarly within the functions of govern-

ment. The state, in order to carry out the purposes of punish-ment, must employ them at some useful labor. Whatever it may be, their work must in some degree come into competition with the labor of others. It is not at all likely that this result ever had, or can have, any material or perceptible influence on wages. But, even if it had, the welfare of the convicts and the interests of the taxpayers are proper subjects for considera-tion.

The question is reduced to the simple inquiry whether the legislature, under the guise of the police power, can regulate the price of labor by depressing, through the penalties of the criminal law, the price of goods in the market, made by one class of workmen, and correspondingly enhancing the price of goods made by another class. If the statute does not tend to produce that result, there is no reason or excuse for its existence, and it would be a useless and arbitrary interference with the liberty of the individual without any possible reason or motive behind it. The law is now defended upon the ground that it was intended to accomplish, and in fact does tend to promote, that very result. If the police power extends to the protection of certain workmen in their wages against the competition of other workmen in penal institutions, why not extend it to other forms of competition? Why not give the workman who has a large family to support some advantage over the one who has no family at all? Why not give to the old and feeble a helping hand by legislation against the competition of the young and the strong? Why not give to the women, the weaker sex, who are often the victims of improvidence and want, a preference by statute over the men? Why confine such legislation to scrubbing brushes and like articles made in prisons, when mul-titudes of men engaged in farming, mercantile pursuits, and al-most every vocation in life are struggling against competition? If the statute now under consideration is a valid exercise of the police power, I am unable to give any reason why the legisla-ture may not interfere in all the cases I have mentioned to help those who need help at the expense of those who do not.

It would be difficult to give any satisfactory reason, legal, moral, or economic, why a person who happens to be confined

in a prison should not be permitted or compelled to earn his
living and pay his way instead of becoming a burden upon the
public, to the detriment of his health and morals. The mere
fact that he is in prison may be due to misfortune, or to his
natural surroundings, and in some cases he may be at least
morally innocent. The state may certainly, for his own benefit,
and for the relief of the taxpaying community, employ him
at some useful labor; and, whether that labor be in building
roads or making shoes, he takes the place of another. If it be
lawful and right to so employ him, it is difficult to see why the
state may, by legislation, depress the value of the products of
his labor when such property is purchased in the ordinary course
of commerce by a dealer therein. The state, while permitting
such property to come within its jurisdiction in the regular
course of trade, cannot then impair its value by hostile legisla-
tion, without a violation of the constitutional guaranties for the
protection of property. Aside from the peculiar restrictions of
revenue laws, the merchant or dealer may buy his goods where
he can obtain them to the best advantage, and any restriction
upon his freedom of action in this respect by state laws is, in a
broad sense, an invasion of his right of liberty, since that term
comprehends the right of the individual to pursue any lawful
calling. I think that the statute in question is in conflict with the
Constitution of this state, since it interferes with the right to
acquire, possess, and dispose of property, and with the liberty
of the individual to earn a living by dealing in the articles em-
braced within the scope of the law. It is an unauthorized limi-
tation upon the freedom of the individual to buy and sell all
such articles, subject only to the law of supply and de-
mand, and the legislation is not within the scope of the police
power.

It has been suggested by some members of the court that the
statute in question can be upheld under the recent amendment
to the state Constitution with respect to prison labor. It should
be observed that no such point was argued or submitted, either
in this court or the court below; but, since some of my brethren
are of that opinion, the question may be properly discussed.
The language of the amendment is as follows: " The legis-

lature shall, by law, provide for the occupation and employ-ment of prisoners sentenced to the several state prisons, peni-tentiaries, jails and reformatories in the state ; and on and after the first day of January, in the year one thousand eight hundred and ninety-seven, no person in any such prison, penitentiary, jail or reformatory, shall be required or allowed to work, while under sentence thereto, at any trade, industry or occupation, wherein or whereby his work, or the product or profit of his work, shall be farmed out, contracted, given or sold to any person, firm, associa-tion, or corporation. This section shall not be construed to pre-vent the legislature from providing that convicts may work for, and that the products of their labor may be disposed of to, the state or any political division thereof, or for or to any public institu-tion owned or managed and controlled by the state, or any political division thereof." Const. 1894, art, 3, § 29. It is said that this provision of the Constitution indicates and ex-presses a public policy on the part of the state to suppress, the competition of prison labor with free labor by forbidding the sale to the general public of prison-made goods. The term " public policy " is frequently used in a very vague, loose, or inaccurate sense. The courts have often found it necessary to define its juridical meaning, and have held that a state can have no public policy except what is to be found in its Constitution and laws. Girard Will Case, 2 How. 127 ; Hollis v. Theologi-cal Seminary, 95 N. Y. 166 ; Cross v. Trust Co., 131 N. Y. 343, 30 N. E. 125 ; Dammert v. Osborn, 140 N. Y. 40, 35 N. E. 407. Therefore, when we speak of the public policy of the state, we mean the law of the state, whether found in the Con-stitution, the statutes, or judicial records; so that the inquiry is whether the provision of the Constitution above cited forbids the sale of prison-made goods to the general public. Either it does or does not. It it does not, there is an end of the argu-ment on that point. If it does, we will see hereafter how it af-fects the validity of this statute. If the framers of the Constitu-tion intended to forbid the sale of prison-made goods to the general public, or to prohibit dealing in them, it was an easy matter to say so in terms that could not be misunderstood. Surely, the poverty of our language is not such as to preclude

framers of the fundamental law from giving plain and direct expression to such a simple thought. But the section above quoted does not forbid the sale of any article of property. It deals only with modes of employing convicts, and with practices that had formerly existed, under which the labor of convicts had become a subject of bargain and sale. It simply abolished what was known as the "contract system" of labor in prisons, whereby the profits of the labor of convicts were secured by contractors or private parties. This is apparent from the language of the section, which begins by providing for the employment of convicts. It then forbids the employment of the inmates of penal institutions at any trade or industry whereby "his work or the product and profits of his work shall be farmed out, contracted, given, or sold to any person." What is it that this language forbids? Not dealing in tangible things or articles of property wherever made, but the farming out, contracting, giving away, or selling of convict labor. The words "product and profit of his work" do not refer to articles of property, but to the net value of labor. If the framers of the Constitution intended to prohibit dealing in any article of merchandise, surely they would not have described the article by such vague terms as the "products of work." A manufactured article is not known in common parlance, in law or political economy, as the "product of labor." Of course, labor enters into its production, but in many cases it is an insignificant element. The article is the product of raw material and labor combined, or, as it is commonly expressed, labor and capital. The prohibition against dealing in any article of property cannot be found in this section without giving to the words a strained and unnatural meaning. If any of the penal institutions of the state happen to have a farm attached to it, worked by the convicts,—as some of them probably have,—it would be a very narrow construction of this section to hold that the products or profits of the farm, whether consisting of cattle or other farm produce, could not be sold to the general public, because it would be the products and profits of prison labor.

But if it be assumed, for the purpose of the argument, that the Constitution does forbid the sale of prison-made goods to

the public, it would not help the statute in question, but, on the contrary, would furnish an additional reason for its condemnation. If the Constitution forbids the sale of such goods, or prohibits dealing in them as merchandise, then clearly the legislature has no power to enact laws regulating and permitting such sales. That this was the purpose and was the obvious effect of the statute in question in its entire scope and meaning must, of course, be admitted. Therefore, if the section means what is claimed for it, the legislature has attempted to regulate and permit what the Constitution forbids. It has attempted to regulate and permit the sale of prison-made goods by fixing upon them a badge of their origin, when the Constitution provides that they shall not be sold at all. It is difficult, therefore, to understand how any one, who believes that the Constitution interdicts the sale of convict-made goods, can at the same time reach the conclusion that the statute is in harmony with the Constitution. It would be manifestly unjust and inconsistent for the state, while it encourages and commands the employment of convicts, and becomes itself the patron and customer of prison-made goods, to prohibit its citizens from dealing in the same property. What policy could the framers of the Constitution have had in view when providing for the employment of convicts, and for drawing all supplies needed by the state from goods produced in the prisons, if at the same time they forbid the general public from dealing in the same class of goods? When it is asserted that the lawmakers intended to employ convict labor in the production of property, and at the same time enacted that the property so produced should not become a part of the general mass of merchandise in the state, or the subject of bargain and sale, like other property, we look for language in the Constitution so clear and explicit that no other construction is possible to be put upon it; but such language is not there. This construction would really impeach the honor and justice of the state, make it the sole beneficiary of convict labor, and the sole competitor with free labor. I think the Constitution is open to quite another construction, and one much more honorable to the state.

But such a construction of the Constitution must, if adopted,

encounter another and still more serious obstacle. Assuming that it forbids the sale in this state of the convict-made goods of Ohio, it is in conflict with the commerce clause of the Federal Constitution. The article described in the indictment in this case came into this state from a penal institution in Ohio through the operation of interstate commerce. The argument in favor of the validity of the statute assumes and asserts that it was not only the purpose of the statute, but of the Constitution of the state, to discriminate against such articles and in favor of the same articles produced by free labor, in the markets of this state. It was a regulation of commerce by means of which the value of merchandise produced in another state was to be depressed, or its sale entirely prohibited. No state can, in its sovereign capacity or in its fundamental law, enact anything in violation of the Federal Constitution, any more than can the legislature, acting in a representative capacity. That Constitution is the supreme law of the land, anything contained in the Constitution or statutes of any state to the contrary notwithstanding. A state Constitution which is in violation of the supreme law is of no more force than a state statute open to the same objection, so that, even if this statute was not in conflict with our own Constitution, it would come under the condemnation of the Constitution of the United States. A state law which interferes with the freedom of commerce is not saved by the fact that it applies to all states alike, including the state enacting it. Interstate commerce cannot be taxed, burdened, or restricted at all by state laws, even though operating wholly within its own jurisdiction. If it is a regulation of commerce, the law relates to a subject within the exclusive jurisdiction of Congress, upon which the state has no power to legislate. It matters not whether the regulation be under the guise of a law requiring a municipal license to sell certain goods, or a health law requiring inspection of the article, or a label law, as in this case, requiring the article to be branded or labeled. When they operate as burdens or restrictions upon the freedom of the trade of commercial intercourse, they are invalid. Brennan v. City of Titusville, 153 U. S. 289, 14 Sup. Ct. 829; Brimmer v. Rebman, 138 U. S. 78, 11 Sup. Ct. 213 ; Minnesota v. Barber,

136 U. S. 313, 10 Sup. Ct. 862; Welton v. Missouri, 91 U. S. 275; Webber v. Virginia, 103 U. S. 344, Ward v. Maryland, 12 Wall. 418; Voight v. Wright, 141 U. S. 62, 11 Sup. Ct. 855; Bowman v. Railway Co., 125 U. S. 465, 8 Sup. Ct. 689, 1062; Guy v. Baltimore, 100 U. S. 134, Gloucester Ferry Co. v. Com., 114 U. S. 196, 5 Sup. Ct. 826; Brown v. Houston, 114 U. S. 622, 5 Sup. Ct. 1091; Robbins v. Taxing Dist. 120 U. S. 489, 7 Sup. Ct. 592; Gulf, C. & S. F. R. Co. v. Ellis, 165 U. S. 150, 17 Sup. Ct. 255; Allgeyer v. Louisiana, 165 U. S. 578, 17 Sup. Ct. 427; People v. Hawkins, 85 Hun, 43, 32 N. Y. Supp. 524. This statute manifestly discriminates against the sale of goods made in a prison in the state of Ohio by a certain class of workmen, and in favor of the same articles when made outside a penal institution, and by free labor. In some of the states labor is much cheaper than in others. But the state where labor commands the highest price cannot make discriminating regulations for the sale of the goods made in the state where it is cheapest, in order to favor the interests of its own workmen. One state may have natural advantages for the production of certain goods by reasons of location, climate, or the rate of wages over another state where it costs more to produce them, but the latter cannot by hostile legislation drive the cheaper-made goods of the former out of its markets, even though such legislation would increase the wages of its own workmen. Trade and commerce between the states must be left free. The Constitution intended that it should be affected only by natural laws and the ordinary burdens of government imposed through the exercise of the taxing power equally on all property. The police power of a state cannot be used to depress the price or restrict the sale of articles of commerce merely because they happen to be made in a prison, or by a certain class of workmen, while the same articles made in some other place, and by free labor, are left untouched by the regulation. A citizen of this state who happens to buy goods made in a prison in Ohio has the right to put them upon the market here on their own merits, and if this right is restricted by a penal law, while the same goods made in factories are untouched, such a law is a restriction upon the freedom of commerce,

and the objection to it is not removed by the fact that it may have been enacted in the guise of a police regulation. The validity of such a law is to be tested by its purpose and practical operation, without regard to the name or classification that may have been given to it.

This state has declared its policy to utilize convict labor in the production of such articles as the government itself, or that of any political division, or the management of any public institution may need. The convict labor necessary to supply such a large consumption must necessarily, in some degree at least, affect the wages of free labor, if the argument in support of this law be correct; but the general public good overbalances any evil, real or imaginary, that may proceed from that policy. Some other state may not see fit to take all the profits of convict labor itself, but to sell the products in the market; and when the articles thus produced have been absorbed into the general mass of merchandise, they cannot be made the object of hostile legislation to depress their value, any more than if they had been made in private manufacturing establishments. The statute in question is aimed at property produced by a certain kind of labor, and the plain purpose is to depress its value or restrict its sale in order to enhance the price or enlarge the demand for the same kind of property produced by some other kind of labor. It belongs to a class of laws which have become quite common in recent years, all resting largely upon the notion that the important problems involved in the social or industrial life of the people may be solved by legislation. This theory has, no doubt, a certain fascination over some minds, but, so long as legislative power is circumscribed by the restrictions of a written Constitution, a statute like this cannot be sustained by the courts. Whether tested by the Federal or state Constitution, it is, I think, an invalid law. The judgment of the courts below sustaining the demurrer to the indictment should be affirmed.

BARTLETT, J. (dissenting).—The courts below have held the law (chapter 931, Laws 1896) regulating the sale of convict-made goods in this state to be in violation of the provisions of

the Federal Constitution vesting in Congress the power to regulate commerce among the several states (Const. U. S. art. 1, § 8, subd. 3), and consequently void. It is urged that the act also violates the United States Constitution, providing as follows: "The citizens of each state shall be entitled to all privileges and immunities of citizens in the several states" (Id. art. 4, § 2, subd. 1); also giving Congress power "to make all laws which shall be necessary and proper for carrying into execution the foregoing powers. * * *" Id. art. 1, § 8, subd. 18. It is further argued that the Constitution of this state is violated wherein it provides: "No person shall be * * * deprived of life, liberty or property without due process of law; nor shall private property be taken for public use, without just compensation." Const. N. Y. art. 1, § 6. I am of opinion that this legislation is a legitimate exercise of the police power of the state and not repugnant to the Federal or state Constitution. In entering upon the discussion of this appeal, it is well to state the precise question presented, as the able briefs of counsel have taken rather a wide range. The act under consideration (chapter 931, Laws 1896) provides that all goods made by convict labor in penal institutions shall, before being sold, or exposed for sale, be branded, labeled, or marked as therein provided. It further prescribes that a person having in his possession for sale, or offering for sale, any such goods, without the brand, mark, or label required by law, or removes or defaces such brand, mark, or label, is guilty of a misdemeanor, and punishable by fine, imprisonment, or both. The defendant is charged in the indictment with having in his possession for the purpose of sale certain goods manufactured by convict labor in a prison in the state of Ohio, and known by him at the time to have been so manufactured, without any brand, mark, or label thereon, as required by law; that he did feloniously, willfully, unlawfully, and with criminal intent offer for sale and sell a scrub brush brought from a prison in the state of Ohio into this state for the purpose of sale. As the facts alleged in the indictment stand admitted by the demurrer, we have to deal with a defendant whose guilty knowledge and criminal intent are fully established. This being so, the question is, can the defendant

be punished by the state of New York without violating its own or the Federal Constitution? If the act of 1896 is a proper exercise of the police power, it is valid legislation, enforceable by the courts. This act is declaratory of the deliberate policy of this state that free labor shall be protected from disastrous competition with the convict system, which pays to the workman no wages, and therefore finds little difficulty in supplanting the wage earner in the public markets. That this is the policy of the state is witnessed by the action of the constitutional convention of 1894, which was ratified by the people. The amendment then adopted reads in part. " The legislature shall, by law, provide for the occupation and em ployment of prisoners sentenced to the several state prisons, penitentiaries, jails and reformatories in the state; and on and after the first day of January, in the year one thousand eight hundred and ninety-seven, no person in any such prison, penitentiary, jail or reformatory, shall be required or allowed to work, while under sentence thereto, at any trade, industry or occupation, wherein or whereby his work, or the product or profit of his work, shall be farmed out, contracted, given or sold to any person, firm, association or corporation, * * *." Const. N. Y. art. 3, § 29. This policy is evidently designed to conserve the prosperity and welfare of the wage earners in this state, and we are thus brought to the vital question whether the fundamental law and the statutes framed to this end are sustainable as a proper exercise of the police power. It is as difficult as it is undesirable to define the limits of the police power. It has been said to be " the general power of a government to preserve and promote the public welfare, even at the expense of private rights." 18 Am. & Eng.Enc. Law, p. 740. Judge Earl remarked in Re Jacobs, 98 N. Y. 108: " The limit of the power cannot be accurately defined, and the courts have not been able or willing definitely to circumscribe it." Judge Cooley, in his Constitutional Limitations (4th Ed. 719), says: " The limit of the police power in these cases must be this: the regulations must have reference to the comfort, safety, and welfare of society." The supreme court of Illinois in Town of Lake View v. Rose Hill Cemetery Co., 70 Ill. 194, referring to the police

power, said : "It may be assumed it is a power co-extensive with self-protection, and is not inaptly termed the law of paramount necessity.' * * * It may be said to be that inherent and plenary power in the state which enables it to prohibit all things hurtful to the comfort, safety, and welfare of society." This much of definition shows that it must be determined under the facts of each case whether the attempted exercise of the police power is proper.

A few additional facts will now be pointed out as still further narrowing the field of inquiry. Under the Constitution of this state, as already quoted, and the legislation in aid thereof (chapter 429, Laws 1896), no prison-made goods manufactured here can be sold to the general public, as they are only to be disposed of to the state, its political divisions and public institutions. The law we are considering (chapter 931, Laws 1896) does not discriminate against the citizens of other states in favor of our own, as did the law of 1894 (chapter 698, Laws 1894), and which was held by the supreme court of this state violative of the interstate commerce provision of the Federal Constitution. People v. Hawkins, 85 Hun, 43, 32 N. Y. Supp. 524. On the contrary, the law of 1896 throws open the markets of this state to the convict-made goods of all other states, subject only to one restriction, while our own penal institutions are cut off from this privilege by constitutional provision. The one restriction mentioned, to which the citizens of other states are subject, is that their prison-made goods must be branded, labeled, or marked " Convict-Made," followed by the year and penal institution in which they were manufactured. So it it inaccurate to say, as has been said, that the law of 1896 prohibits the sale of convict-made goods from foreign states, within our jurisdiction, as it only requires that buyers in this state shall be advised as to the origin of the goods, and decide for themselves whether they will purchase or not. The fact remains that penal institutions of other states are more highly favored than our own under the policy which has been adopted to protect free labor. It does not by any means, follow, as suggested by the learned counsel for the respondent, that the marking of the goods will render it impossible to sell them. A low price for

an article will doubtless attract buyers in the future as it has in the past. The precise question, then, is whether it is competent for this state, in the exercise of the police power, in order to promote the public welfare and prosperity, to impose the restriction, already pointed out, upon the sale of convict-made goods. I am of opinion that it is, for two reasons : (1) It is self-evident that the protection of free labor from competition with convict-made goods in our domestic markets will promote the public welfare and prosperity; and (2) it is competent for the state to protect its citizens from fraud or deception, when any such goods are offered for sale, by advising him of the fact that they are convict-made, so that he may act with full knowledge in the premises. In case of In re Rahrer 140 U. S. 554, 11 Sup. Ct. 865, Chief Justice FULLER said: "The power of the state to impose restrictions and burdens upon persons and property in conservation and promotion of the public health, good order, and prosperity is a power originally and always belonging to the states, not surrendered by them to the general government, nor directly restrained by the Constitution of the United States, and essentially exclusive." In Kidd v. Pearson, 128 U. S. 1, 9 Sup. Ct. 6, it was held that the right of a state to enact a statute prohibiting the manufacture of intoxicating liquors within its limits is not affected by the fact that the manufacturer of said spirits intends to export them when manufactured. The police power of a state is as broad and plenary as the taxing power (as defined in Coe v. Errol, 116 U. S. 517, 6 Sup. Ct. 475), and property within the state is subject to the operation of the former so long as it is within the regulating restrictions of the latter. Mr. Justice LAMAR, in delivering the opinion of the court, at page 23, 128 U. S., and at page 11, 9 Sup, Ct., said: "As has been often said, 'legislation [by a state] may in a great variety of ways, affect commerce and persons engaged in it, without constituting a regulation of it within the meaning of the Constitution,' unless, under the guise of police regulations, 'it imposes a direct burden upon interstate commerce,' or interferes directly with its freedom." Vide cases there cited. In Pittsburg & S. Coal Co. v. Louisiana, 156 U. S. 590, 15. Sup. Ct. 459, the state of Louisiana

passed an act providing for the appointment of coal and coke boat gaugers, and making it compulsory upon all persons selling coke or coal in a barge to have it inspected and gauged. The law applied to coal and coke brought in from other states, but it was sustained as a proper exercise of the police power. This was a regulation calculated to promote the public welfare and prosperity and protect the citizens of Louisiana from fraud and deceit. It affected commerce, but in no legal sense regulated it. See Smith v. Alabama, 124 U. S. 464, 473, 8 Sup. Ct. 564; Budd v. New York, 143 U. S. 517, 12 Sup. Ct. 468; s. c. 117 N. Y. 1, 22 N. E. 670, 682. There are many cases holding that the state may regulate and prohibit the manufacture and sale of articles of commerce. In Plumley v. Massachusetts, 155 U. S. 461, 15 Sup. Ct. 154, the statute of Massachusetts of March 10, 1891 (chapter 58), " to prevent deception in the manufacture and sale of imitation butter," in its application to the sale of oleomargarine artificially colored so as to cause it to look like yellow butter, and brought into Massachusetts, was held not in conflict with the power vested in Congress to regulate commerce among the several states. The court held in People v. Arensberg, 105 N. Y. 123, 11 N. E. 277, that such an act was constitutional, although it appeared that the coloring matter was not injurious to health. An act " to prevent deceptions in the sale of vinegar" was held constitutional by this court, although it was proved to be entirely healthy and safe as a food product, notwithstanding the artificial coloring matter therein contained. People v. Girard, 145 N. Y. 105, 39 N. E. 823. The oleomargarine cases do not rest upon the well recognized incident of the police power to protect the public health, but stand on a much broader ground, to wit, the right of the state to protect its citizens against fraud, deception, and unjust dealing in trade.

Judging the act of 1896 by the general principles already commented upon, it does not, as matter of law, interfere with the power of Congress to regulate commerce among the states; nor is it repugnant to any of the constitutional provisions referred to, either Federal or state. The facts in the case before us are peculiar, and we are called upon to apply well-settled

principles to new conditions. If the oleomargarine, vinegar, and kindred cases are within the police power, can it be properly said that a law which not only seeks to shield the citizen from fraud, deception, and unjust dealing in trade, but has for its object the further 'purpose, in pursuance of an enlightened public policy, to promote and protect the interests of free labor as against convict labor, is beyond the power of a sovereign state to enact? I am of opinion that both upon principle and authority the act of 1896 was a legitimate exercise of the police power. I am unable to agree with respondent's counsel as to the grave consequences likely to follow the reversal of this judgment. The possible cases he has cited by way of illustration do not, I think, involve the principle here decided. In fact, many cases are cited by him in the United States supreme court that are not in point. It is only necessary to refer to those where discriminations were made between different classes in the ranks of free labor; also the salesman license cases, and the inspection of living animals before slaughter, in the state enacting the law. It is clear that the principles involved in all these cases have no application here. The criticism is made on behalf of respondent that it is against the honor and dignity of the state to purchase products forbidden to the private citizen under the exercise of the police power. This criticism involves a misapprehension of the situation. It is most fitting that the state should protect its citizens, and the interests of free labor, as already pointed out; and it is equally proper that it should provide employment for the inmates of our penal institutions. In this connection it is necessary to examine more critically the amendment of the state Constitution made in 1894 (article 3, § 29), as it is seriously argued that it does not indicate a public policy on the part of the state to suppress the competition of prison labor with free labor. The opening sentence reads as follows: "The legislature shall, by law, provide for the occupation and employment of prisoners sentenced to the several state prisons, penitentiaries, jails and reformatories in the state; and on and after the first day of January, in the year one thousand eight hundred and ninety-seven, no person in any such prison, penitentiary, jail or reformatory, shall be required or

allowed to work, while under sentence thereto, at any trade, industry or occupation wherein or whereby his work, or the product or profit of his work, shall be farmed out, contracted, given or sold to any person, firm, association or corporation." As I read this provision, it not only prohibits the work of prisoners from being farmed out or contracted to others, but it also prohibits the products from being given or sold to any person, firm, association, or corporation. If the products of the work of prisoners cannot be given away or sold, then it, of necessity, follows that the product of prison labor in this state cannot be dealt in by the inhabitants thereof. I do not see how there can be any question with reference to the meaning of the words used ; but, should there be, it would seem as if all doubt must, of necessity, vanish upon reading the concluding sentence of this section : "This section shall not be construed to prevent the legislature from providing that convicts may work for, and that the products of their labor may be disposed of to, the state, or any political division thereof, or for or to any public institution owned or managed and controlled by the state, or any political division thereof." If the product of prison labor was intended to be sold, and thus enter the general commerce and traffic of the state, what is the purpose of this clause ? The mind can suggest none. The provision would be meaningless under such a construction. But when it is read in connection with the former provision quoted, and in view of my understanding of the meaning of that provision, it has a well-defined purpose. Under the former provision, as we have seen, the products of prison labor cannot be sold to individuals, etc. This would leave the prisons with the power to manufacture, but not to dispose of their products. The latter provision relieves this situation. While the goods cannot be sold to any person, firm, association, or corporation, they may be disposed of to the state, or any political division thereof, or to any public institution owned or managed and controlled by the state or any political division thereof. In other words, the state may supply its own wants from its own prison labor, but the product of such labor shall not be given or sold so as to enter the general traffic in manufactured goods. This construction is the

one contemplated by the constitutional convention, as is evident from the report of the committee and the discussion which followed between the members of the convention. Record 3, N. Y. Const. Conv. p. 1370. The report was made by Mr. McDonough, who said in explanation thereof that : " The first. sentence provides that the prisoners shall work; that they shall. be occupied and employed as they ought to be. The second clause provides that after January 1, 1897, the products of their labor, and their labor itself, shall not be farmed out or sold to· outside parties. The object is to prevent the selling of the goods manufactured by these prisoners, or to sell their labor.. The next provision is that they shall work for the benefit of the state, or any political division of the state ; in other words,. it provides that they may do any kind of work that is neces-· sary for the state, or for any of the institutions in the state that are· owned and controlled by the state, or any political division of· the state." He then proceeds with an elaborate argument calling attention to the evil resulting from the competition of free with prison labor, refers to an interview with Mr. Pillsbury, who stated, in substance, that the requirements of the state, the civil divisions thereof, and of its institutions were sufficient to furnish employment for all of the prisoners in the state. Then he states that in England and in France articles made by the convicts are the property of the government, and are never sold, and quotes the following from the report of the general su· perintendent of prisons of Massachusetts : " It is well known· that the state, through its penal, corrective, and eleemosynary institutions, is a very large consumer of manufactured products. Most of these products are such as could be quite easily manu· factured by prison labor, the state being the purchaser and con-- sumer of its own products. The irritation of free labor by com-- petition with prison labor would be absolutely avoided, and the· manufacturer would cease his complaints as to the injustice of meeting prison-made goods in the open market. There would be a constantly growing demand for these prison-made products, thus insuring steady employment and a stability in the establishment of industries that would be a vast benefit to the discipline and welfare of the prisons." A sharp discussion

followed, extending through 40 pages of the record, in which opposition was made to the provision prohibiting the selling of prison-made goods, but in the entire discussion not a single objection was expressed against the prohibition of the farming out, or the contracting of the work of prisoners. That question the convention evidently deemed settled by the vote of the people in 1883, when the question as to whether the contract system then in force should be abolished was submitted to them. Further extended quotations might be made from the numerous speeches made upon the subject during its consideration by the convention, but I do not regard it necessary. They all refer to one controversy. The members of the convention all understood the meaning of the provision as prohibiting the sale of prison-made goods to any person, corporation, or association other than the state, the civil divisions thereof, and the institutions controlled by it, so that such goods could not enter the markets of the state in competition with other manufactured goods. They differed as to the advisability of incorporating such a provision in the organic law, but not as to its meaning. Here we have a well-settled public policy of the state incorporated in the Constitution prohibiting dealing in the product of prison-made goods by our citizens so as to bring them in competition with free labor. If dealing in prison-made goods is against public policy, and is prohibited by the Constitution, the legislature may also regulate the dealing in such goods, and provide for the criminal punishment of those who violate the act. Such statute would be in harmony, and not in conflict, with the Constitution. If against public policy, then it would be within the police powers of the state, and not in conflict with the provisions of the Constitution of the United States investing Congress with power to regulate commerce among the several states, to legislate as to the sale of foreign convict-made goods. Plumley v. Massachusetts, 155 U. S. 461, 15 Sup. Ct. 154, and cases before cited. The judgment appealed from should be reversed, the demurrer to the indictment disallowed, and the defendant permitted to plead.

PARKER, C. J. (dissenting).—If the prevailing opinion cor-

rectly construes section 29 of article 3 of the state Constitution the conclusion reached by it is well founded, for it has now been declared by the people of this state by an amendment to the organic law that the public welfare demands that free labor shall not be put in competition with prison labor. As construed, the provision was not intended to prevent dealing in any article of merchandise, even if made by convicts in our own state prisons, but it " simply abolishes what was known as the ' contract system ' of labor in prisons, whereby the profits of the labor of convicts were secured by contractors or private parties." I deem it safe to say that such a construction will surprise the members of the convention that recommended the Constitution to the people for adoption, as well as it will surprise the public at large ; for the propriety and wisdom of the provision in question were the subject of much discussion in the public prints and elsewhere at the time of its submission to the people. On the one hand, it was urged as most unjust that labor employed in manufacturing should be subjected to the competition of unpaid, compulsorily enforced labor, while, on the other, it was strenuously insisted that the burdens of the taxpayers should not be added to by restraining the convict from contributing in whole or in part to his own support. That the provision has been heretofore read by those charged with the administration of the affairs of prisons, and those engaged in a consideration of the question from the standpoint of public interest, according to the natural and ordinary meaning of the language employed, seems to me demonstrated by the opinion of Judge BARTLETT. I shall therefore assume that the people of the state have forbidden the selling of articles manufactured in our prisons, for the reason that they deemed it to be against a sound public policy to permit some of the citizens of the state skilled in certain kinds of labor to the subjected to competition with the unpaid labor of convicts.

It is now too late to consider the subject generally from the point of view of the political economist, for the people, in whom reside all power, have set at rest that question, so far as this state is concerned. This statute neither prohibits nor attempts to prohibit other states, or the citizens of other states, from putting

prison-made goods upon our markets; nor does it prohibit our own citizens from buying or selling them. If it did, then concededly, the statute would be in violation of the commerce clause of the Federal Constitution, and void. It simply requires that prison-made merchandise shall be so branded that our citizens shall know where the goods they are buying were made. This they have a right to know, for they voted to burden themselves with additional taxation rather than longer to permit a competition which they regarded as a public wrong, and they are, therefore, entitled to such legislation as will permit them to know the truth in regard to articles offered them for sale, in order that they may not, through lack of information, have forced upon them that which they would not buy advisedly. The commerce clause of the Federal Constitution does not stand in the way of their having such information, inasmuch as the Constitution of this state establishes a public policy in the working out of which the legislature may go to this extent, at least, under the police power of the state.

The decisions of the United States supreme court in the oleomargarine and other cases, some of which are referred to in Judge BARTLETT'S opinion, furnish adequate support for that assertion. They establish, generally, that commerce between the states may be regulated to some extent under the police power of the state, which includes, among other things, efforts to prevent fraud and deception on purchasers. In view of the public policy declared by the people of this state through their Constitution, I am of the opinion that this statute is well within the police power of the state, and therefore, under the decision in the Slaughterhouse Cases, 10 Wall. 273, not repugnant to the Federal Constitution. I concur with Judge BARTLETT for a reversal of the judgment.

O'BRIEN, J., reads for affirmance of judgment. GRAY, MARTIN, and VANN, JJ., concur for affirmance, upon the ground that the statute conflicts with and is repugnant to the commerce clause of the Federal Constitution. BARTLETT, J., reads for reversal. PARKER, C. J., reads memorandum concurring with BARTLETT, J. HAIGHT, J., concurs for reversal.

Judgment affirmed.