(84 Misc. Rep. 372)

## CAHILL v. GILMAN.

(Supreme Court, Trial Term, Kings County. February, 1914.)

1. TRIAL (§ 165*)—DIRECTION OF VERDICT.

While, under the direct provisions of Code Civ. Proc. § 1187, the court may, after a special verdict, pass upon a motion for nonsuit or direct such general verdict as either party is entitled to, it would ordinarily direct a general verdict conforming to the special verdict, unless it was clearly against the weight of the evidence, or the motion for nonsuit should be granted notwithstanding such verdict.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 373, 374; Dec. Dig. § 165.*]

2. CONTRACTS (§ 138*)—LEGALITY.

If the contract, at the basis of plaintiff's cause of action, is illegal, he cannot recover, though he declared upon a contract which was colorably lawful.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 681–700; Dec. Dig. § 138.*]

3. GAMING (§ 17*)—VALIDITY OF CONTRACTS—PUBLIC POLICY.

Laws 1802, c. 44, § 1, declares all racing, etc., of horses for any bet or stakes to be a common nuisance and an offense, and that the bettors and parties thereto shall be punished, and section 5 provides that all contracts for or on account of any sums bet or depending on any such race "or concerning the same" shall be void. The same provisions were substantially embodied in the Revision of 1813, vol. 1, p. 222, in 1 Rev. St. 1829, pt. 1, c. 20, tit. 8, art. 5, § 55, and in article 3, § 8, of the same chapter, and were continued by the Percy-Gray Law (Laws 1895, c. 570), and section 1 of the original act, as modified, is now part of Penal Law (Consol. Laws 1909, c. 40) § 987, and section 5 constitutes sections 991 and 992 of the Penal Law, section 991 of which makes all wagers depending upon any race, etc., "unlawful," and section 992 of which provides that all contracts on account of any money wagered, as provided in the previous section, shall be void. *Held*, in view of the declared policy of the state, that a

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

contract by plaintiff with decedent for services, which largely consisted in making wagers for decedent on horse races and acting as decedent's betting commissioner, was contrary to public policy.

[Ed. Note.—For other cases, see Gaming, Cent. Dig. §§ 29–35; Dec. Dig. § 17.*]

4. CONTRACTS (§ 108*) — VALIDITY — CONTRARY TO PUBLIC POLICY — "PUBLIC POLICY."

The individual opinion of the judge is not the test for determining whether a contract is contrary to public policy, since the "public policy" of the state is to be ascertained from the established law, as found in the Constitution, statutes, and judicial records, being the principle of law that no one can lawfully do that which tends to injure the public or to be against the public good.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 498–503, 505, 507–511; Dec. Dig. § 108.*

For other definitions, see Words and Phrases, vol. 6, pp. 5813, 5814; vol. 8, p. 7773.]

5. PRINCIPAL AND AGENT (§ 81*)—ACTIONS FOR COMPENSATION—ILLEGAL CONTRACT.

An agent employed to carry out an unlawful transaction cannot recover compensation from his principal either upon an express or implied contract, in view of the common-law maxim, "frustra legis auxilium quaerit qui in legem committit."

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 194–214, 219, 223; Dec. Dig. § 81.*]

6. CONTRACTS (§ 108*)—LEGALITY—PUBLIC POLICY.

If an act contracted for is in violation of public policy, the contract is unenforceable, whether the act be criminal or not.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 498–503, 505, 507–511; Dec. Dig. § 108.*]

7. CONTRACTS (§ 137*)—LEGALITY—INVALIDITY IN PART.

If a contract, which contains an element which is legal and one which is against public policy, is entire, the legal consideration cannot be separated from that which is illegal, so as to make the legal part enforceable, irrespective of the equities between the parties to the contract.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 701–712; Dec. Dig. § 137.*]

Action by Thomas F. Cahill against Lester L. Gilman, as executor of Theophilus Gilman, deceased. On motion for dismissal of the complaint and to set aside a verdict for plaintiff. Motion for dismissal granted.

George W. Martin, of Brooklyn, for plaintiff.
Brush & Crawford, of New York City, for defendant.

BENEDICT, J. At the conclusion of the testimony, the defendant renewed the motion made and denied at the end of the plaintiff's case to dismiss the complaint on the ground that the plaintiff had failed to establish any legal contract, and that, if he had established any contract at all between himself and the decedent, whose executor he was suing, it was an illegal and void contract. The court reserved decision of the motion and submitted two questions of fact to the jury in manner following:

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Question 1: Was the plaintiff, between the 30th day of October, 1907, and the 27th day of August, 1912, employed by Theophilus Gilman as secretary and companion at the rate of $5 per day?

Question 2: If you shall find that the plaintiff was so employed by said Theophilus Gilman, did he render services as such secretary and companion, and, if so, for what period?

The jury answered the first question in the affirmative, and to the second they answered, "One thousand and thirteen days." The effect of these findings, if the court should direct a general verdict in plaintiff's favor, as it is authorized to do by section 1187 of the Code of Civil Procedure, would be to give to the plaintiff a verdict for $5,065.

[1] The court may, however, under this section, notwithstanding such verdict, "pass upon the motion to nonsuit or direct such general verdict as either party may be entitled to"; but it would ordinarily direct a general verdict in conformity with such special verdict, unless the special verdict were clearly against the weight of the evidence, or unless the motion to nonsuit ought, as a matter of law, to be granted non obstante veredicto. When the special verdict was rendered, the defendant moved to set it aside as contrary to law, contrary to the evidence, and against the weight of the evidence, and as excessive. Decision upon this motion was also reserved, and briefs have since been submitted by both parties.

The plaintiff sued to recover a sum in gross, $7,500, alleged to be the reasonable value of services rendered by him to the defendant's testator, under a contract of employment resting in parol, between October 30, 1907, and August 27, 1912, as secretary and companion. By a bill of particulars, to which no objection was made, the cause of action was modified so as to allege a verbal contract, by the terms of which the decedent employed the plaintiff as companion and confidential clerk on October 30, 1907, and agreed to pay him $5 a day for his services, and that the plaintiff rendered services up to the decease of the testator, which occurred on August 27, 1912, and it was upon this theory that the action was tried. I shall assume, as indeed I must for the purposes of the motion for a nonsuit, that there was evidence of employment of the plaintiff by the testator to render some kind of services for him, or at least that there was enough evidence of employment to go to the jury; but the more serious question which the motion presents is whether the employment was not one to perform services which were unlawful because against the public policy of this state.

[2] Unless the contract were in reality not unlawful, the plaintiff cannot recover upon it, even though he declared upon one which colorably was lawful, and the motion for a nonsuit should, in such case, be granted.

[3] Upon the trial, the plaintiff sought to establish the contract of employment by the witness Moran, whose testimony upon this point was as follows:

"When he (Theophilus Gilman) quit bookmaking at the fall meeting of Sheepshead Bay, he said that he was very sorry that he had to lay us off, but that he was going to continue with Tommy Cahill (the plaintiff) at a salary of $5 a day. We were getting $10, and he said that he could not afford

to pay him that amount of money, but he would retain him at $5 a day to do his betting for him and look after his business." Mins. pp. 5, 6.

The witness was then asked this question by counsel for the plaintiff:

"Q. What else did he (Theophilus Gilman) say he was to act as, as betting commissioner and attending to his horses, and what else?"

To which the witness replied:

"To be his personal attendant and to be his confidential agent, looking after the entering of horses and doing his betting for him on the race track." Mins. p. 6.

And upon cross-examination the witness testified that, at the conversation had at the Sheepshead Bay meeting in 1907, Gilman said that he was "to use him (the plaintiff) in betting," and that "Tommy (the plaintiff) was doing his betting for him," and that Gilman said this on many occasions. Mins. pp. 27, 28.

It is apparent from the entire testimony that, during the period in which the services were rendered, the plaintiff was acting as a "betting commissioner," as he himself testified, "at all race tracks around New York that were running," and received commissions to and did make bets there and elsewhere for the testator upon horses in which the testator was interested, taking money from the testator to be used in making such bets and collecting for him moneys resulting therefrom. An examination of the testimony clearly indicates that while the plaintiff may occasionally, if the testimony be true, have rendered some slight personal services to the testator which fall within the classification of services usually rendered by secretaries or confidential clerks (such, e. g., as going to his bank to deposit or draw moneys for him), yet not only a material part, but practically all the services which the plaintiff was employed to perform and which he did perform, were in the way of a betting commissioner (that is, as has been said, acting as agent for the testator in betting or wagering moneys upon the result of horse racing). This kind of service was unquestionably, upon the evidence, what the testator employed the plaintiff to render and what the plaintiff undertook to perform. If we eliminate from the case the evidence as to service connected with wagering moneys upon horse racing, there is nothing left of the original claim for services of a legitimate nature, and it is impossible, from the evidence, to segregate the latter class of services from the former.

The question is therefore squarely presented, by the defendant's motion for a nonsuit, whether such an agreement as the evidence tends to establish in this case can be enforced, or whether it is not an illegal agreement because contrary to public policy, and for that reason void and unenforceable.

[4] The test by which the courts determine whether a given act or contract is or is not against public policy does not rest in the mere individual opinion of the judge who is called upon to decide the question, otherwise different judges might reach different conclusions upon the same state of facts, according to their complexional view of the abstract morality of the question. Public policy is the principle of law

that no one can lawfully do that which has a tendency to be injurious to the public or against the public good. It is ascertained from the established law of the state, whether found in the Constitution, the statutes, or judicial records. A state can have no public policy except what is found in its Constitution and laws. People v. Hawkins, 157 N. Y. 1, 12, 51 N. E. 257, 42 L. R. A. 490, 68 Am. St. Rep. 736, citing Hollis v. Drew Theological Seminary, 95 N. Y. 166; Cross v. U. S. Trust Co., 131 N. Y. 343, 30 N. E. 125, 15 L. R. A. 606, 27 Am. St. Rep. 597. See, also, Girard Will Case, 2 How. (U. S.) 127, 11 L. Ed. 205. Where the state has spoken through its Legislature, there is no room for speculation as to what the public policy on that particular subject is. Once ascertained contracts which contravene it "are not sometimes valid and sometimes invalid, but they are always invalid, and the courts will never tolerate or enforce them."

[5] It is the rule in this state, and I believe in many other states as well, that one who is employed as an agent to carry out a transaction which is unlawful cannot recover, either upon an express or implied contract, for compensation for his services against his principal, and I take it that this is an illustration of the maxim of the common law, "Frustra legis auxilium quærit qui in legem committit." (In vain does he who offends against the law seek the help of the law.) Kent v. Judkins, 53 Mo. 160, 163, 87 Am. Dec. 544. In Gray v. Hook, 4 N. Y. 449, 455, interpreted in the cases cited in 1 N. Y. Anno. Dig. 280, what had been said in 1 Comyn on Cont. 30, was approved, namely:

"All contracts or agreements which have for their object anything which is repugnant to justice, or against the general policy of the common law, or contrary to the provisions of any statute, are void; and, whenever a contract or agreement is entered into with a view to contravene these general principles, there is no form of words, however artfully introduced or omitted, which can prevent courts of law and equity from investigating the truth of the transaction, for ex turpi contractu actio non oritur is a rule both in law and equity."

In 20 Cyc. 934, it is said:

"A contract in direct promotion of illegal gambling is also illegal and cannot be enforced."

In support of this is cited Harris v. White, 81 N. Y. 532, where it was held that one could recover for services in driving a horse in a race for a purse or prize at any place within the state where, by statute, such races are authorized, but that the rule would be otherwise if the case had involved the making of bets, wagers, or stakes upon the result of the race. Chief Judge Folger, in speaking of the distinction between the two things, says (page 539):

"A bet or wager is ordinarily an agreement between two or more that a sum of money or some valuable thing, in contributing which all agreeing take part, shall become the property of one or some of them, on the happening in the future of an event at the present uncertain; and the stake is the money or thing thus put upon the chance. There is in them this element that does not enter into a modern purse, prize, or premium, viz.: That each party to the former gets a chance of gain from others, and takes a risk of loss of his own to them. 'Illegal gaming implies gain and loss between the parties by betting, such as would excite a spirit of cupidity.' People v. Sergeant, 8 Cow. 139. A purse, prize, or premium is ordinarily some valuable thing, offered by a person for the doing of something by others, into the strife for which

he does not enter. He has not a chance of gaining the thing offered; and, if he abide by his offer, that he must lose it and give it over to some of those contending for it is reasonably certain. Such is the meaning of the words now, in common understanding, in the practical use of them, and in the legislative purview, as will be seen by the citations which we make. Laws of 1868, c. 91, § 3; chapter 523, Laws of 1860, § 3; Laws of 1872, c. 609, § 2."

In Ruckman v. Pitcher, 1 N. Y. 392, Judge Jones, after examining the several provisions of the Revised Statutes relative to racing and gambling upon the results of racing, said:

"While, therefore, the special acts which have been referred to may exonerate the parties concerned in the race in question from the provisions and penalties of the act against the racing of animals, I see no reason to doubt that the wager upon the result of the race comes fully within the provisions of the act declaring all wagers unlawful, and all contracts relating to them void."

From an early period in the history of this state until the present time, the making of bets or wagers upon the result of horse racing has been unlawful by statute, although not under all circumstances constituting a crime.

By chapter 44, Laws of 1802, § 1, it was provided that:

"All racing and running, pacing or trotting of horses, mares or geldings, for any bet or stakes, in money, goods or chattels, or other valuable thing, shall be and hereby are declared to be common and public nuisances, and offenses against this state; and the authors, bettors, stakers, stake holders, parties, contrivers and abettors thereof, shall be proceeded against, and punished by fine and imprisonment at the discretion of any court having cognizance thereof; and all public officers concerned in the administration of justice, are hereby strictly enjoined to cause this act to be faithfully executed."

It was further provided in section 5 that all contracts "for or on account of any sum or sums of money, or other thing, bet or staked, or depending on any such race or races as aforesaid, or concerning the same, * * * shall be deemed and adjudged void in law." This act is also found in the Revision of 1813, vol. 1, p. 222.

Section 1, above recited, was, with some slight changes, embodied in the Revised Statutes of 1829 (passed December 3d) as section 55, art. 5, tit. 8, ch. 20, pt. 1. Section 5, above recited, was embodied in section 8 of article 3 of the same chapter, and has never been repealed, not even by the provisions of the Percy-Gray Law (chapter 570, Laws of 1895). See Mendoza v. Levy, 98 App. Div. 326, 90 N. Y. Supp. 748, per Mr. Justice Hirschberg. Section 1, as modified, is now part of section 987 of the Penal Law, and section 5 now constitutes sections 991 and 992 of the same law, which now read as follows, unchanged since 1827, except by making two sections out of one, viz.:

"Sec. 991. Illegal Wagers, Bets and Stakes. All wagers, bets or stakes, made to depend upon any race, or upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event whatever, shall be unlawful."

"Sec. 992. Contracts on account of money or property wagered, bet or staked are void. All contracts for or on account of any money or property, or thing in action wagered, bet or staked, as provided in the preceding section, shall be void."

It thus appears that for more than a century it has been unlawful to engage in this state in the making or laying of bets or wagers upon

the results of horse racing; and while it is true that not every form of such gambling constitutes a crime unless it be "accompanied by record, registry or the use of some part of the paraphernalia of professional gamblers, except in the case of pool selling where probably no writing or record is necessary to constitute the crime" (People v. Langan, 196 N. Y. 260, 267, 89 N. E. 921, 923, 25 L. R. A. [N. S.] 479, 17 Ann. Cas. 1081, per Cullen, C. J.), yet it is equally true that it is the settled public policy of the state, as shown by its statutory enactments, that contracts to engage in or to promote this form of gambling are void in law and will not be sustained by the courts. The contention of the plaintiff that the act was not criminal, and that therefore the plaintiff can recover, overlooks this distinction and finds no support in the authorities cited on his brief.

[6] If it be violative of public policy, it vitiates the contract and renders it unenforceable.

One further point made by the counsel for the plaintiff should be noticed. Where a contract or transaction is held to be illegal and void, and consequently not enforceable, such contract cannot be sifted and the legal services rendered under it, or in its pursuit, separated from the illegal services and a recovery had for so much of the service as shall be adjudged to be legal.

[7] Where an entire agreement contains an element which is legal and one which is void, as being against public policy, the legal consideration cannot be separated from that which is illegal and void, so as to found an action on the legal consideration. Courts of justice are not required, in any way, to aid in the enforcement of an illegal contract, or to lend their assistance, in any respect, to an illegal transaction. Their action is controlled by a principle having no respect to the equities between the parties, or their bad faith towards each other, but rests upon the solid and broad foundation of a wise and prudential governmental policy. Rose v. Truax, 21 Barb. 361.

I therefore hold that the contract sued upon is void and illegal in its entirety as against the public policy of this state, as found in its statutes. The special verdict in favor of the plaintiff is set aside as contrary to law and contrary to the evidence and the weight of the evidence, and the defendant's motion for a dismissal of the complaint is granted, with costs. Thirty days' stay of execution after service of notice of entry of judgment and 30 days to make case on appeal granted to the plaintiff.